FILED



2009 Mar-30  AM 10:59
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **TONDALAYA EVANS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **CIVIL ACTION NO.** |
| | ) | **CV-07-JEO-2172-S** |
| **BOOKS-A-MILLION,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

---

## PLAINTIFF'S RESPONSE IN OPPOSITION TO
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

Alicia K. Haynes
HAYNES & HAYNES, P.C.
1600 Woodmere Drive
Birmingham, AL  35226
Phone:  (205) 879-0377
Fax: (205) 879-3572
E-mail:  akhaynes@haynes-haynes.com

# **TABLE OF CONTENTS**

I.   RESPONSE TO MOVANT'S STATEMENT OF FACTS . . . . . . . . . . . . . 1

II.  PLAINTIFF'S ADDITIONAL UNDISPUTED FACTS . . . . . . . . . . . . . 11

III. SUMMARY JUDGMENT STANDARD . . . . . . . . . . . . . . . . . . . . . . . . 30

IV.  LEGAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

    1.   The Equal Pay Act Claim. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

    2.   Plaintiff's Claim of Title VII Sex Discrimination . . . . . . . . . . . . 35

         A.   Plaintiff's Assignment to the Risk Manager position.
              . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

              1.   *Evans was denied an opportunity to apply for the job she*
                   *had held for ten years and further subjected to an*
                   *adverse employment decision when she was adversely*
                   *reassigned to a new position but at the same salary and*
                   *without any job description, but told to figure it out.*
                   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

         B.   Plaintiff was wrongfully denied her bonus pay in opposition to
              how similarly situated males were treated.
              . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

         C.   The defendant's defense is barred by collateral estoppel
              . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

         D.   Plaintiff's pay claims are timely under the Lilly Ledbetter Fair
              Pay Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

    3.   Plaintiff's Prima Facie Case of Retaliation . . . . . . . . . . . . . . . . . . 44

         A.   Plaintiff Did Engage in Protected Conduct . . . . . . . . . . . . . 44

         B.   Causal Connection. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

4.      FMLA interference claim. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

5.      Plaintiff's Defamation and Invasion of Privacy Claims . . . . . . . . . . 50

V.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **TONDALAYA EVANS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **CIVIL ACTION NO.** |
| | ) | **CV-07-JEO-2172-S** |
| **BOOKS-A-MILLION,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

---

**PLAINTIFF'S RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

---

COMES NOW the Plaintiff, Tondalaya Evans, and submits her response in opposition to Defendant Books-A-Million's (hereinafter "BAM") Motion for Summary Judgment.

**I.    RESPONSE TO MOVANT'S STATEMENT OF FACTS**

1.    Generally agreed but clarified that Evans had additional job duties other than those listed by BAM. Plaintiff's job duties also included processing payroll taxes and reconciling all payroll accounts. (Evans depo., pp. 19-26; Evans Aff. ¶¶ 2, 5, 17, 29, 32, 35). Since Plaintiff's termination, Alvis Lewis (male) handles payroll taxes with a salary of over $100,000 per year. (Meeks depo., pp. 207-208; PX20, Bates no. 1140). Robert Altheide (male) handles worker's compensation and general liability claims with a salary of over $75,000 per year.

(PX4).  Brian Hobby (male) handles all payroll with a salary of over $50,000 per year.  (Meeks depo., pp. 74-75; Hobby depo., p. 5).

2.      Agreed but clarified that Plaintiff had been employed for over 10 years and worked up to the salary of $54,500.  (Evans depo., p. 16; PX20, Bates no. 1140; see also No. 1 above).

3.      Agreed in part.  Plaintiff also reported to Doug Markham and Chad Tice who were both male and the ultimate decisionmakers in Evan's termination and adverse treatment.  (Evans depo., pp. 80-82).

4.      Disputed.  (Meeks 2nd depo., pp. 310-311; 315; Tice depo., p. 101; See also stipulation of Defendant's attorney during the deposition of Tice that there is no substantiating comments that support this contention despite Meeks repeated testimony to the contrary.   However, this contention propounded by the defendant does support BAM's decision to replace Evans while she was off on maternity leave while requiring her to work from home during her entire maternity leave. (Tice depo., p. 101; Meeks 2nd depo., p. 317; Evans Aff. ¶¶ 17, 18).

5.      Denied.  Meeks testified she did not conduct market research. (Meeks 2nd depo., p. 331).  Plaintiff was further told this was a lateral move, not a promotion and would receive her same rate of pay of $54,500.  (Evans depo., p. 45).

2

6.     There is no evidence to support this contention.  (See response to number 4 above).

7.     Agreed that BAM began a confidential search to replace Plaintiff but denied that there is any evidence that Defendant sought to replace the payroll manager with a lower salary of $45,000.  In fact, Brian Hobby testified he was hired at $48,600 and was told this was the starting salary by Meeks.  Hobby now makes $50,000 annually, ($4,000 less than when plaintiff held the position, hardly the "savings" that support replacing a ten year veteran employer). (Hobby depo., p. 7).  However, after a brief recess, Hobby changed his testimony to say he was "confused" about his starting salary because after three months of employment he had received a $3,500 "bump" in his salary and started out at $45,000.  (Hobby depo., p. 50).  Tice could not explain why Hobby would have received an increase after three months of employment as corporate employees are not subject to probationary raises.  (Tice depo., pp. 38-39).

8.     Disputed as to salary; admitted that BAM hired a male to replace Plaintiff as payroll manager the same day she was terminated, March 27, 2007. (Hobby depo., p. 6).  Further, Robert Altheide replaced Plaintiff as Risk Manager at a combined salary of $123,000.  (Tice depo., pp. 23-24, 44).

3

9.     Disputed.  Plaintiff, despite her qualifications, was not allowed to apply for the payroll manager job which she had held for ten years but was told she would be placed in a risk manager job for which she was not qualified without a job description and told she would train her replacement for four months and there was no other alternative.  (Evans depo., pp. 86-88, 96).  Evans testified she pleaded to keep her payroll job, which was her career path and where she had certifications.  (Evans depo., p. 87).  Hobby had no certifications.  (Hobby depo., p. 25).

10.     Agreed that the CFO, Doug Markham, and the Vice President of Human Resources, Chad Tice, told Plaintiff she had no other choice but to accept the risk manager position that was undefined, without a job description, and a lateral move without a pay increase.  (Evans depo., pp. 79, 87, 96).  Further, Plaintiff was told that she would train her replacement for four months and then figure out what the risk manager job would be.  (Tice depo., p. 45; Evans depo., p. 164; DX16).  In contrast, Robert Altheide was placed in the risk manager position at a salary of $75,000 – $20,000 more than the Plaintiff – and a job description provided to him.  (Meeks depo., pp. 74-75; Tice depo., p.133).

11.     Plaintiff removed her personal belongings because she was told during her vacation that a new payroll manager would be starting in her position that Monday.  Plaintiff did not know where she would sitting or if she even had a

4

desk or computer.  (Evans depo., p. 95).  Plaintiff did not delete computer files

which was confirmed by her replacement, Brian Hobby.  (Hobby depo., pp. 20, 43-

44; Evans depo., pp. 94-95).

12.    Agreed in part.  Clarified above in number 11.  Plaintiff did not refuse

to work but indicated she wanted to stay in her chosen career path and the job she

had been performing for ten years.  Plaintiff asked what her options were and was

told she was terminated.  Further, this contention is the subject of collateral

estoppel, having been administratively decided and reviewed, finding plaintiff did

not refuse the position and did not engage in misconduct.  ( Evans depo., p. 50;

PX45).

13.    Agreed but clarified.  Robert Altheide is also a comparator in that this

new male employee was placed in the Risk Manager position at a higher salary

than the plaintiff was told.  Plaintiff was told the move was a lateral move and she

would not receive an increase and her salary would remain at $54,500.  Altheide

was awarded the position but at a salary of $75,000 and had been downsized from

his previous job.  In other words, he was not lured to the position with an attractive

salary.  Further Plaintiff throughout her tenure with the company was always given

more responsibility, without equal pay or staff, in direct contrast to how male

managers were treated.  (See PX22; Evans Aff. ¶ 2; See also Tice depo., pp. 123-

5

124).  Plaintiff managed biweekly payroll totaling millions of dollars for over
5,000 employees.  (Evans depo., p. 20; Hobby depo., p.19).  Plaintiff was also
responsible for payroll taxes totaling millions of dollars biweekly, monthly and
quarterly.  *Id.* Unable to admit or deny based on lack of knowledge.  However,
plaintiff also had two direct reports, Sharon Waters and Justin Suits.  Plaintiff's
pay did not change when she took on more responsibility or more employees.  (See
response to number 13 above; Evans Aff. ¶¶ 2, 8, 10, 16).

14.     See response to number 14 above.

15.     Disputed.  See response to number 13, 14, and 15 above.

16.     Disputed.  See No. 13 above.

17.     Denied.  See No. 13 above.

18.     Agreed, but Dickson was demoted from managing accounts
receivables because he was performing poorly.  His responsibilities were
decreased, but his pay nor bonus was ever decreased.  (Tice depo., pp. 123-124;
Evans Aff. ¶ 2).

19.     See response to number 19 above.

20.     See response to number 19 above.

21.     Agreed.

6

22.     Denied.  The defendant has not been able to produce any policy or directive that an employee must be employed on the day the audit committee of BAM's board of directors meets and votes to approve the annual financial statements.  (Tice depo., pp. 139-142; PX48, 49).  In fact, Tice stated he could use and negotiate the bonus plan as he saw fit in awarding severance packages.  (Tice depo., p. 114).  During the related case of *Kim Smith v. BAM*, Tice testified to a contrary position - that he offered Smith the opportunity to take vacation days - even taking a week's vacation -  to extend her employment date so she would qualify for her bonus plan which was to be paid or approved on March 29, 2007. [1] Smith was terminating her employment voluntarily and leaving for another employer.  (Evid. Submission Exh. 6, Decl. of Tice, *Smith v. BAM, 07-CV-01691-RRA*).  On March 26, 2007, Tice e-mailed Meeks to inquire what Plaintiff's bonus would be for the year and then terminated her the next day on March 27, 2007. (PX29).  Tice then justified refusing Evans her bonus pay because she missed the

---

[1]Kim Smith denied this conversation ever took place or that the offer was ever extended.  Tice contended that Smith refused his offer and the reason she was not paid her bonus.  However, this statement by Tice shows that he could manipulate the BAM bonus plan as he saw fit.  Which is why he inquired two day prior to terminating Evans, exactly how much her bonus would be for the year.  PX29; See also, *Kim Smith v. BAM*, *07-CV-01691-RRA*.  Tice admits that he never offered Evans the same "deal", to take vacation to extend her employment by two days even though Evans worked her entire maternity leave without FMLA leave at the insistence of her supervisors.  (Tice depo., pp. 28, 130; Evans Aff. ¶ 14).

pay-off date by two days, even though she had worked the entire year and met her performance goals that determined the bonus.  However, males employees that were employed less than one year were paid their bonus.  (See PX20, 30; Tice depo., pp. 58-60, 123-124; Meeks depo., pp. 273-274; Evans Aff. ¶ 2).  The year was completed in January, but bonuses not paid until March.  (Meeks depo., pp. 46, 172, 174).

23.     Denied.  (Evans depo., pp. 103-104; Meeks depo., 305; Tice depo., 110-111).  Further, Plaintiff's termination date on the Defendant's computer system is April 23, 2007.  (See PX36).  However, Plaintiff was not paid her bonus of $8,000.  Further, Plaintiff was told it was necessary to work through her maternity leave and implement the new ADP payroll system, so she would qualify for all of her bonus.  (Evans Aff. ¶ 14).

24.     Agreed.

25.     Denied.  See number 23 above.

26.     Denied.  See number 23 above.

27.     Agreed, but clarified that Plaintiff questioned a male receiving extra vacation over a female who did not receive this same benefit but was more qualified, both in her department.  (Evans Aff. ¶ 26).  Plaintiff also questioned when a female applicant for a position that she was hiring was made to undergo job

8

testing but the male who was ultimately awarded the position (Justin Suitts) was not required to undergo the same testing. (PX10, 11; Evans Aff. ¶ 8).

28.    Disputed in that defendant has with each job move that Plaintiff has made, immediately subpoenaed her employment records during the probationary period trying to jeopardize her continued employment. (PX58). Plaintiff had not listed nor disclosed that she had a new job in any court document or discovery. Further, in a second interview for a job, Plaintiff felt assured in receiving she was asked by the CFO if she knew Doug Markham. Plaintiff indicated she knew Markham. Thereafter, Plaintiff never heard back from the potential employee. (Evans depo., pp. 155-156).

29.    Agreed but not material as Plaintiff was not in the payroll specialist position. She was the payroll manager. Denied that Plaintiff never complained about discriminatory employment practices. Plaintiff complained to Sandi Meeks, Chad Tice and Doug Markham specifically about her treatment in the workplace. (DX16; PX15, 16, 22, 26, 27, 44, 45, 47, 48, 49, 50, 52, 53).

30.    Denied. Plaintiff worked full time from home while on maternity leave. Plaintiff requested leave pursuant to the FMLA and was denied. Plaintiff was told by Meeks that Markham and Tice had decided that Evans would work from home while on maternity leave. Plaintiff was not asked but rather was told she would work during

9

her maternity leave.  Plaintiff had a family member come to her home and take care of her newborn while Plaintiff processed and generated payroll from her home. Meeks reminded Plaintiff that her annual bonus included the ADP project which had to be tested and completed while Plaintiff was on maternity leave.  Plaintiff fully complied and received her full salary because she worked full time during maternity leave and began working full time while she was still at the hospital having delivered her child two days earlier.  Plaintiff complained to Kathryn King, benefits manager that she wanted to take short term disability instead of working from home.  Plaintiff was told by Meeks and Tice that the company would provide her with a laptop so that she would not need to take leave, but continue working full time.  The laptop Plaintiff was provided had all features installed where the Plaintiff could work from home processing payroll, making tax payments, and working on the ADP project.  (Meeks depo., pp. 245-246; 248, 250-251, 259; Evans depo., pp. 114-117).

31.    Denied.  See 31 above.

32.    Denied.  (Evans depo., pp. 114-117).

33.    Agreed.  Markham held a meeting where he told BAM employees that Plaintiff had resigned her employment for family reasons.  (Evans Aff. ¶ 44).

34.    Agreed, Plaintiff did not lose any money because of this comment though it precipitated numerous phone calls from co-workers and cast Plaintiff in a

10

false, embarrassing and hurtful position invading her privacy.  (Evans depo., pp. 125-126).  This is similar to the treatment plaintiff received when her employment records were subpoenaed within one month of accepting a new position as payroll manager with Energen.  (PX58).  The defendant did not explore alternative means to acquire into plaintiff's new employment, but during her probationary period of employment with Energen subpoenaed her employment  records.  The subpoena was issued before plaintiff had even amended any of her discovery responses apprising the defendant of her new position.  See Argument below where other courts have found this conduct retaliatory, an invasion of privacy and harassing.

## II.   **PLAINTIFF'S ADDITIONAL UNDISPUTED FACTS**

1.      Evans began work for BAM on November 17, 1997, as a Staff Accountant.  Within a year, she was promoted to Sales Audit Manager.  In 2000, Evans promoted to Payroll Manager.  Six months later, Evans was given the Benefits department to manage as well as Payroll.  Her title became  Payroll and Benefits Manager.  In 2004, based on SOX, the  benefits aspect of Evans' job was removed and became a single department, which Evans no longer managed.  In the place of Benefits, Evans was given Insurance to manage becoming the Payroll and Insurance Manager.  Evans remained the Payroll and Insurance Manager until she was terminated on March 27, 2007.  Evans was making $54,500 managing two

11

departments.  Males in the company managing one department were making significantly more.  In the accounting and finance department Evans was head of the Payroll department; Jason Thomas was over the inventory department; Damian Doggett was over the cash department, and Derek Dickson was over general accounting. All finance departments  reported to Sandi Meeks and Doug Markham. Because  Evans was head of Payroll, she was aware of the pay of these individuals and how they received a pay increase greater than hers and with each promotion or additional duties being added.  Males were able to advance financially more quickly than Evans.   Evans voiced concern to Sandi Meeks about this discrepancy and received only a small increase that did not close the pay gap.  (Evans Aff. ¶ 2).

2.     Evans received numerous awards and honors while working at BAM. Among them were: the Employee of the Month (on three (3) separate occasions) and the Store Support Award (one of the biggest honors at BAM).  Evans never received a bad evaluation or any write ups.  Evans was often praised for her exceptional work ethics and dedication to the company.  (Evans Aff. ¶ 3).

3.     Sandi Meeks received a promotion to Director of Finance in August 2005.  With this promotion, she became Evans manager.  Meeks had no previous payroll or insurance experience.  (Evans Aff. ¶ 4).

4.     In January 2006, Evans announced that she was pregnant with her second child.  The company was in the process of implementing a new payroll ADP system.  This project consisted of converting an outdated in-house system (LAWSON) to ADP.  Evans attended all ADP implementation meetings and training.  Evans never missed a day of work while pregnant.  All doctor's visits were scheduled around her lunch.  (Evans Aff. ¶ 5).

5.     Evans was told that after seven (7) years with a staff that consisted of a Payroll Clerk and herself, that she would be approved to hire a Payroll Specialist.  Evans had been asking for more staff for years due to the volume of payroll and insurance duties.  All other managers had a least one degreed staff member that had knowledge of the area that could act as a back up.  This new Payroll Specialist would serve as Evans backup while on leave.  Evans was only allocated to spend $28,000 to hire this person.  Other departments headed by males had similar staff that started with a salary of  $32,000 or above.  Evans was already at a disadvantage in hiring support staff, unlike male managers. (Evans Aff. ¶ 6).

6.     Evans met with internal resistance in her efforts to hire a new staff member.  Evans complained to Sandi Meeks about the delay.  (Evans Aff. ¶ 7).

7.     Evans interviewed three prospective employees and Sandi Meeks did not like any of the applicants (all happened to be females).  Evans selected one of

13

the three applicants that met all the posted qualifications.  Evans was once again

stalled when Meeks and Tice wanted the female applicant to take an employment

test.  The company had never tested corporate associates previously.  Betty Hayes,

Personnel Specialist, confirmed to Evans that her applicant was the first to take this

made up test.  There was another associate in Real Estate that was hired at the same

time as Evans applicant was interviewed and that associate never took a test.   It

turned out that this was the same test given to store managers.  The test had

nothing to do with the position.  Monica Smith, HR Director, received the test

results back and it showed the female applicant passed every part of the test, but

scored one point below the cut off for integrity and trust.  Sandi Meeks refused to

proceed with this female applicant.  (Evans Aff. ¶ 8).

8.     Justin Suitts (male), human resource clerk, expressed his interest in

the position.  Sandi Meeks was thrilled, even though Suits had no payroll

experience and met none of the posted qualifications.  Meeks hired Suits on June

26, 2006 over Evans' wishes.   (Evans Aff. ¶ 10).

9.     BAM was changing to a new version of the LAWSON payroll system.

Evans was told that the company would only use ADP for about 6 months.  Sandi

Meeks informed Evans that she would be on that project full time in January 2007.

14

Meeks told Evans she was the best person for the job since she had years of LAWSON and payroll experience.  (Evans Aff. ¶ 12).

10.     Evans was scheduled to work until her due date of September 1ˢᵗ 2006. Two weeks before Evans was to go on maternity leave, Sandi Meeks changed the ADP "Go Live" date yet again to after Evans came back from maternity leave. (Evans Aff. ¶ 13).

11.     Evans approached Sandi Meeks about filling out Family Medical Leave Act (FMLA) paperwork.  Meeks informed Evans that she, Tice and Markham decided she would work while on leave and be paid her full salary. Evans was given a new laptop with all BAM programs installed that would allow her to work from home.  Evans felt she had no choice and if she did not work from home, she would not receive her bonus.  Evans completing the ADP project was part of her bonus goals.   Evans mentioned several times, that she wanted to take her 60 percent salary and go on disability.  (Evans Aff. ¶ 14).

12.     Kathryn King, Benefits Manager, expressed her disgust for the fact that Evans was being made to work while on leave.  Evans expressed her preference to take leave, receive short term disability and not have to work from home full time.  Sandi Meeks told Evans that with the "Go Live" date being

15

pushed up again she needed Evans to continue to work on the ADP project and regular payroll duties.  (Evans Aff. ¶ 15).

13.     Evans last day of work was August 29, 2006, at 9:00 pm.  Evans stayed late that day just to get the payroll complete.  Evans baby was born August 30, 2006, at 12:10pm.  Friday, September 1, 2006, was Evans first official day working from home.  Evans was just leaving the hospital when she received a phone call from Sharon Waters, payroll clerk on payroll issues.  Once Evans got home, she plugged up her laptop and started working.  Evans immediately started answering emails and working throughout the weekend.  Sharon Waters, Justin Suitts, Angela Wilson, and several other associates called and e-mailed Evans at home.  (Evans Aff. ¶ 16).

14.     On Monday, September 4, 2006, Sandi Meeks started emailing Evans with work to do.  Evans worked sometimes more than eight hours a day.  On a payroll week, Evans' mother would sit with her newborn while Evans completed payroll and all associated duties for 5,000 employees from home.  Evans participated in conference calls with ADP and weekly conference calls with Sandi Meeks, Steve Johnson (programmer), and Kevin Brooks (Director of IT).  Evans processed payroll and sent it to the bank via modem biweekly.  Evans kept up with the federal deposits and monthly taxes.  She helped with the 401k audit while she

16

was out via email and phone.  Evans answered emails from Angie Wilson, HR in American Wholesale Book Company (AWBC a wholly owned subsidiary of BAM), with problems.  (Evans Aff. ¶ 17).

15.     After the end of Evans' sixth week of leave, Sandi Meeks told Evans to report to work the following Monday.  Evans told Meeks that she had planned to take at least 10 weeks maternity leave.   Meeks became hostile to Evans and expressed she was not happy about Evans plans for leave.  Meeks and Evans had previously discussed Evans wanting to take at least 10 weeks maternity leave, but Meeks changed her mind.  Meeks told Evans that she needed to be present in the BAM office for ADP visits and to complete the implementation process.  Meeks advised Evans that not being physically at work would slow them down.  Evans came to work on that following Tuesday to attend an ADP meeting at Meeks' insistence and stayed half the day even though Evans had not been released by her doctor to return to work.   (Evans Aff. ¶ 18).

16.     Evans continued to test the ADP system  from home.  Sandi Meeks stopped answering Evans emails and telephone calls and the little communication between the two was addressed with hostility on the part of Meeks.  She stopped approving Evans work and when Evans called her to discuss the project, she would tell Evans she was heading to a meeting and would call her back.  Meeks never

17

would call back.  Meeks also stopped including Evans on the conference calls for

ADP.  Evans had questions about other issues with payroll that needed Meeks

approval but Meeks would not respond.   Meeks suddenly starting sending Evans

demanding emails about documentation that she needed.  Evans would complete

the documentation but Meeks would not respond.  (Evans Aff. ¶ 19).

17.    Evans started copying Markham, CFO, on emails that she sent Meeks.

Evans hoped this would make Meeks respond and also let Markham understand

how the project was going.  (Evans Aff. ¶¶ 20-21).

18.    Markham moved the project's "Go Live" date to January 2007.  This

angered Meeks and she told Evans not to copy Markham on any other emails.

Meeks then demanded that Evans no longer perform her regular payroll duties

from home and instead focus 100% of her time on the ADP project.  Evans told

Meeks she still had to do monthly, biweekly and quarterly payroll taxes plus month

end reconciliations.  Meeks told Evans that she would worry about that later.  In an

email, Evans reiterated to Meeks that they would face penalties if taxes were not

timely completed.  Meeks did not respond.  (Evans Aff. ¶¶ 21-22).

19.    Meeks wanted to bring over 100 files to Evans home for her to work

on garnishments.  Evans sent an email to Meeks telling her that she was working as

hard as she could already.  Evans told Meeks that she would come to the office on

a Saturday if necessary to key garnishments and that she did not want 100 files in her home.  Meeks again became angry with Evans and was unprofessional.  (Evans Aff. ¶ 23).

20.    Evans returned to work on October 31, 2006,  a week and a half before she had planned.  The atmosphere with Meeks, Tice and Markham was cold and hostile.  None of the three thanked her for working her entire maternity leave from home.   Sandi Meeks refused to discuss any of the disagreements and problems she and Evans had while Evans was on leave even though Evans went to Meeks office first thing to discuss.  (Evans Aff. ¶ 24).

21.    Steve Johnson and Evans worked around the clock to fix all ADP issues and the company went "live" January 2, 2007.  The implementation was a complete success with all data correct and everyone paid on time.  (Evans Aff. ¶ 25).

22.    In January 2007, Sharon Waters, made Evans aware that Meeks had given Justin Suitts an extra day off from work.  In an email dated January 23, 2007, Meeks expressed to Evans that she gave Suits a day off, but that she could not approve the same for Waters to take an extra day off.  Meeks told Evans to tell Suits that he would now have two weeks off instead of one week.  Evans confirmed with Monica Smith, HR, that Suits was only eligible for one week of

vacation per the company policy.  Evans confronted Meeks that to favor the male employee over the female employee in her department would cause issues of fairness and create discord.  Meeks told Evans to offer Justin the extra vacation during evaluation.  Evans asked her about Sharon Waters who had been with the company 10 years.  She said "No," she could not give her any more time off. (Evans Aff. ¶ 26).

23.    Doug Markham approached Evans in January telling her about the LAWSON project and that 75% of her time was allocated to this project.  Evans was told by Meeks that she was the best person for this project.  (Evans Aff. ¶ 27).

24.    On Sunday, January 14, 2007, Evans spotted Tice and Meeks coming from Anthony's car wash in Hoover and going into Starbucks together.  Starbucks is BAM's  competitor.   On the following Monday, Evans mentioned to Meeks and Tice that she had seen them going into Starbucks on a Sunday.  Evans joked that they should have been going to Joe Muggs (Books-A-Million coffee shop) and not Starbucks.  Tice, Vice President of Human Resources, immediately turned cold toward Evans and would no longer speak to Evans in passing.  (Evans Aff. ¶ 28).

25.    February was the start of year end processing.  As with all years, Evans successfully completed all of her year end reconciliations and journal entries

before the due date.  Evans was the only Manager in Meeks' department to complete these year end tasks early.  (Evans Aff. ¶ 29).

26.     On March 5, 2007, Evans went to Sandi Meeks to let her know that she was ready to sit for her second and final payroll certification.  Evans told Meeks she was excited about the new LAWSON project and wanted to get this certification done.  Meeks told Evans the company would pay her second certification.  Meeks signed off on Evans' application on March 5, 2007.  Meeks knew from this that Evans' career path was payroll.  However, Meeks and Tice had already posted Evans position on monster.com in February 2007 without telling her.  (Evans Aff. ¶¶ 30-31).

27.     On Tuesday, March 13, 2007, Betty Hayes (Personnel Specialist) came to Evans and asked if she was leaving the company.  Evans told her "No." Hayes said Evans job was posted on Monster.com confidentially.  Hayes said it had been posted since February 21, 2007.  (Evans Aff. ¶ 31).

28.     Evans immediately went to Tice's office and told him that her job had been posted on monster.com confidentially.  Evans asked why her job was ending. Tice would not respond but told Evans to see Meeks.  Evans went immediately to see Meeks who informed Evans that she was looking for a Payroll Manager with LAWSON implementation experience.  Evans reminded Meeks of her 10 years

21

experience with LAWSON and her 7 years experience with payroll.  Meeks said it would be in the company's best interest to get a more experience person but Evans was confused since she had gone through the Finance portal implementation, two Lawson upgrades, SOX documentation and compliance, and an ADP implementation.  Evans could not see how she was suddenly not qualified.  (Evans Aff. ¶ 32).

29.     Sandi Meeks informed Evans that she would be placed in a newly created position of "Risk Manager" but the position was not promotion but a lateral move and her pay would stay the same.  Evans asked what was the position and Meeks could not explain but did mention that Evans would have to travel.  With a newborn, this did not interest Evans.  Jami Wadkins, Ex-Finance Director, was responsible for Risk Management prior to Meeks taking over this department. Wadkins had her position taken from her and reassigned to a position requiring daily travel to Florence, Alabama.  The same thing happened to Shanda Johnson when she lost her position after maternity leave and was subsequently severed. (Evans depo., pp. 159-160; Evans Aff. ¶ 33).

30.     Evans told Meeks that she was not interested in this new position because she could not travel with a baby at home.  Evans told Meeks that she was happy with payroll and wanted to continue with that career path since she had two certifications

in payroll.  Evans reminded Meeks that she did not have extensive Risk Management experience.  Evans was not certified and did not have the knowledge that she had with payroll.  Meeks stated that she and Markham thought Evans was better suited for the Risk Management position.  Evans had ten years payroll experience and less that two years insurance experience.  Evans insurance experience did not include Risk Management.  (Evans Aff. ¶ 33).

31.    Evans was not provided a job description for the risk manager position and was told she would not get a description until after she had trained Hobby for four months.  (DX16).

32.    The next day, Evans met with Meeks again and told her that she was still not interested in the Risk Manager's position but wanted to stay in her position in Payroll.  Evans reminded Sandi Meeks that she and Doug placed her on the LAWSON project 75% of her time.  Evans had gone to the initial meetings and trainings.  Dee Dee Cogan, LAWSON consultant, told Evans that she wanted to place her on the conversion team because she had the most knowledge and provided her with the most information.  Monica Smith had only 6 months LAWSON Experience, Chad Tice only had 9 months LAWSON experience, Sandi Meeks had less than 1 year LAWSON payroll experience and Evans had 10 years.  This was the team.  Meeks told Evans that if they do not find a qualified payroll

person with experience in LAWSON then nothing would change.  (Evans Aff. ¶ 35).

33.    On March 14, 2007, the confidential ad on monster.com was changed to non confidential and listed Books-A-Million as the company.  (Evans Aff. ¶ 3; PX2).

34.    On March 19th thru March 23rd 2007, Evans went on a scheduled vacation but received a phone call on Friday, March 23rd from Meeks telling her that a new person had been hired for her position and would start that Monday. (Evans Aff. ¶ 37).

35.    Evans returned to work on March 26th and went to meet with Meeks, who told her that she had a training schedule already in place and that Evans was to train the new person for four months then Evans would start her new job.  Evans told Meeks that she was not interested in the new position and were there other options available.   Evans expressed to Meeks that she had no intention of resigning from Books-A-Million.  Meeks told Evans that she would either accept the position and train her replacement or would be terminated.   Evans met with Markham and Tice. They reiterated what Meeks had stated.  They told Evans to go home for the rest of the day to think about the new position.  (Evans Aff. ¶ 38).

36.     Since it was payroll week, later that evening Evans attempted to log into her laptop at home so she could finish payroll.  Evans was denied security access.  Evans could not finish payroll.  (Evans Aff. ¶ 39).

37.     Tice sent an email to Meeks on March 26, 2007 inquiring about Evans' age, if she had stock options and what her bonus was for the year.  (PX29).  Tice knew that the board of directors and the audit committee would meet on March 29, 2009 to approve the budget, including the bonuses.  Tice had known this date for several months, if not a year.  (Tice depo., p. 27).

38.     Evans returned to work on March 27, 2007 and  made a point to meet the new payroll person, Brian Hobby.  Evans asked Hobby a few questions about his experience and specifically about his LAWSON experience.  Hobby told Evans that he never heard of LAWSON until he came to Books-A- Million.  He informed Evans that he had worked with other payroll software but not LAWSON.  Hobby told Evans that he had been told she would train him and that  Evans had accepted a new position.  (Evans Aff. ¶ 40).

39.     Tice admitted that Evans was equally qualified for the Payroll Manager position as Hobby.   Tice also admitted he did not ask Evans if she wanted to take a cut in pay to stay in the position.  (Tice depo., p. 119).  Tice admitted he did not

consider Evans for the Payroll position because Hobby could not do the Risk Manager job.  (Tice depo., p. 119).

40.     Hobby admitted that the only LAWSON experience he had was transferring data and had never used the system for payroll.  After Evans' was terminated, he was trained by LAWSON trainers from June to December 2007 on the system by attending training away from the facility.  (Hobby depo., pp. 16, 18, 35-36).

41.     Evans went to Meeks office and asked why her security access was taken away as she had tried to finish payroll and could not.  Meeks informed Evans that she had no idea why Markham or Tice had done that, but instructed Evans that the two men wanted to speak with her.  (Evans Aff. ¶ 41).

42.     The meeting consisted of Tice, Markham and Evans.  Meeks did not attend.  Evans told Tice and Markham that she did not want to accept the Risk Management position but continue in her position as no one would give her a job description or explain the job to her.  Evans also expressed that she did not know why she would have to train the new Payroll Manager for four months as this period would take you almost to the Lawson implementation date of September 2007.  Tice and Markham told Evans that she would either accept the job or resign.  Evans told them that she would not resign but that surely there were other options available.  Tice and Markham then told Evans she was terminated and handed her a

severance document already completed.  Evans asked if she was terminated as of that day and was told yes.  Tice read parts of the letter and told Evans to look it over a couple days and sign and return.  Tice then walked Evans out the door. Evans left her badge and laptop at her desk and left.  (Evans Aff. ¶ 42).

43.     When Evans got home to read the severance letter, she noticed that in order for her to receive her year end bonus that she already earned, she had to sign the severance agreement giving up all her rights to sue.  Evans knew that she did nothing wrong and was being forced to sign the severance just to get her bonus. Evans had already cut year end bonus checks for several associates as of March 16, 2007 and did not understand why she would not receive her bonus unless she signed this letter.  Evans sent Tice an email asking for clarification and why the bonus was part of the letter.  Tice informed Evans that she not eligible for the bonus because the audit committee had not signed off on the bonuses before Evans was terminated and that it was the policy.  Evans was fired on the March 27, 2007; payroll received the bonuses to key in to ADP on March 28, 2007.  The rest of the company received their bonus in the bank on March 30, 2007.  (Evans Aff. ¶¶ 42-43).

44.     Evans asked Chad Tice to email her a copy of this "policy" on the bonus but he refused.  There is no bonus policy but only a manipulation of the bonus by Tice

27

to control who and when receive their bonuses.  (Evans Aff. ¶ 43; PX15, 16, 17, 48, 49, 50, 51, 52, 53, 54, 55).

45.     Evans had several associates call her to tell her that Doug Markham had held a meeting and explained to everyone in the finance and accounting department that Evans had resigned from her position due to family reasons.  This was not true.  (Evans Aff. ¶ 44).

46.     Sheryl Roberts, HR Manager, told Evans' colleagues that Sandi Meeks' plan was for Evans to train the new payroll person and help with the LAWSON project but that Meeks had no intention of keeping Evans.  Once Evans started the new position, Meeks would make the Risk Manager's job miserable and Evans would end up quitting.  (Evans Aff. ¶ 45).

47.     On March 27, 2007, Evans went to the EEOC to file her charge of discrimination against Books-A-Million.  On March 29, 2007, Evans requested to withdraw her funds from BAM savings.  Evans received her check but short $100.00 and no interest.  Evans had to write and email Chad Tice to receive the rest of her funds.  On April 13, 2007, Evans received the $100.00 with no interest. Evans emailed Sharon Waters in payroll and was told that Meeks instructed payroll not to pay Evans her earned interest on her savings.  Evans emailed Chad Tice again on April 16th about her lost interest.  (Evans Aff. ¶¶ 47-48).

48.     On May 11th Evans emailed Chad about not receiving her vacation on her last check.  Two weeks later BAM paid out Evans vacation.  As of today, Evans still has not received her COBRA notification from BAM even though defendant admitted she was entitled to COBRA in the severance agreement. Defendant was so intent on crippling Evans financially that it forgot to follow the law.  (Evans Aff. ¶ 48; Tice depo., pp. 111-112; PX43).

49.     Evans filed for unemployment and Books-A-Million appealed the grant of benefits.  A  hearing was conducted and testimony elicited, wherein BAM provided that Evans had refused to work, abandoned her job and was therefore guilty of misconduct.  The hearing officer held, after a full hearing on the matter, that Evans was entitled to her benefits.  (Evans Aff. ¶ 49).

50.     In this litigation it was disclosed for the first time that Evans' position as risk manager was filled with a male with a starting salary of $75,000. Evans was to start the same position at her regular salary of $54,000.  Evans reviewed the job posting for Risk Manager when it was posted less than one month later.  The job required certifications and designations that Evans did not possess.  (PX12; Evans Aff. ¶ 50).

51.     Two males replaced Evans in her position making $123,000 combined salary in comparison to Evans being paid $54,000.  (Evans Aff. ¶ 50; PX20, 30).

## III.   **SUMMARY JUDGMENT STANDARD**

The evidence presented to the court is always construed in favor of the party opposing the motion.  *Matshushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986). In determining whether the moving party has met its burden on summary judgment, the Court must draw all reasonable inferences in favor of the non-moving party, and it may not make credibility determinations or weigh evidence.  *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 148, 120 S. Ct. 2097, 2110, 147 L. Ed. 2d 105 (2000). Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).   The evidence of the non-movant is to be believed and must receive the benefit of the doubt when his assertions conflict with those of the movant.  All justifiable inferences are to be drawn in his favor.  *Anderson*, 477 U.S. at 255. Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe. See *Wright & A. Miller, Federal Practice and Procedure* § 2529, p. 299 (2d ed. 1995). That is, the court should give credence to the evidence favoring the non-movant, as well as that "evidence supporting the moving party that is <u>uncontradicted</u> and <u>unimpeached</u>, at

least to the extent that the evidence comes from <u>disinterested witnesses</u>." *Id.* at 300.

See also, *Thomas v. The Great Atlantic and Pacific Tea Company, Inc.*, 33 F.3d

326 (5th Cir. 2000) (Emphasis added).

## IV.   **LEGAL ARGUMENT**

### 1.      **The Equal Pay Act Claim.**

The defendant addresses as its first issue on summary judgment Count Three

to plaintiff's complaint, the Equal Pay Act (EPA) claim.  The EPA prohibits

employers from paying an employee at a rate less than that paid to employees of

the opposite sex for equal work.  *See* 29 U.S.C. § 206(d)(1).  When Congress

enacted the EPA, its purpose was to remedy what was perceived to be a serious and

endemic problem of employment discrimination in private industry – the fact that

the wage structure in many segments of American industry has been based on an

ancient but outmoded belief that a man, because of his role in society, should be

paid more than a women even though his duties are the same.  *Prewitt v. St. of Ala.*

*Dept. of Veteran's* Affairs, 419 F.Supp. 2d 1338 (M.D. Ala. 2006) citing *Corning*

*Glass Works v. Brennan*, 417 U.S. 188, 195 (1974).

To establish a violation of the EPA, a plaintiff must first establish a *prima*

*facie* case by showing that she performed work substantially equal to that of a male

comparator and that she was paid less than the male comparator.  The focus at the

prima facie stage is upon the primary duties of the jobs at issue-as opposed to duties that are merely incidental or insubstantial-and the demands the jobs impose with regard to skills, effort, responsibility, and working conditions. *Miranda v. B & B Cash Grocery Store, Inc.,* 975 F.2d 1518, 1533*; see also Corning Glass Works,* 417 U.S. at 195. While formal job titles and job descriptions are relevant to the inquiry of whether job content is substantially equivalent, they are not dispositive. *Arrington v. Cobb County,* 139 F.3d at 865, 876 (11th Cir. 1998); *Miranda,* 975 F.2d at 1533.

Once Plaintiff establishes a prima facie case as applied to even one male comparator, the only way for Defendant to escape liability is to prove, as an affirmative defense, that the wage differential is justified by one of four exceptions set forth in the EPA, each of which requires the defendant to show that the reason for the pay differential was something other than sex. *Irby v. Bittick,* 44 F.3d 949, 954 (11th Cir. 1995).

As articulated above, plaintiff has shown that she was paid a lower salary for the same or equivalent job that males were paid while working in the same department, but assigned different duties. Plaintiff concedes it is difficult to show in any corporation that employees are performing the same job with the same skill. However, it is undisputed that plaintiff was the head of the payroll department in

the finance and accounting department, the same as the comparators that are listed by the defendant: Damien Doggett, Derek Dickson, and Jason Thomas. These three men each headed up a department also within the finance and accounting department and reported to Meeks and Markham. Evans had a college degree, an accounting background, and had worked at BAM for ten years. In her position, she was privy to how the men were treated and paid in comparison to her. Evans saw the pay documents that awarded males a raise when they received additional duties or made a change within the organization. This was unlike how Evans was being treated.

However, the defendant cannot dispute nor even articulate an argument that Evans was not similarly paid nor awarded her bonus under the guise she was two days short of the pay off date when terminated. Male managers, employed less than a full year, were awarded their bonuses. The defendant makes no attempt to hide the disparity even acknowledging the males were classified as partial year positions and paid. (PX20, Bates No. 1140).

It is also undisputed that plaintiff's job of ten years at a salary of $54,500, was split into two positions and two men received each position, but were paid considerable more. Together, they were paid $123,000 to do the same job but with one-half of the responsibility and duties that Evans had performed. Brian Hobby

and Robert Altheide were together paid twice Evans' salary to do her same job. While the plaintiff admits it difficult to prove an EPA claim, but not a Title VII pay claim, against Doggett, Thompson and Dickson, it is undisputed that she proves her prima facie case with Hobby and Altheide as comparators. Summary judgment is due to be denied.

Once a *prima facie* case is demonstrated, to avoid liability BAM must prove by a preponderance of the evidence that the differential is justified by one of four exceptions set forth in the EPA. *Irby*, 44 F.3d at 954 (internals quotations and citations omitted). The four affirmative defenses available to BAM are: (1) a seniority system; (2) a merit system; (3) a system which measures earnings by quantity or quality of production; or (4) a differential based on any additional factor other than sex. *See* 29 U.S.C. § 206(d)(1). BAM relies on the last affirmative defense in its argument with the contention that none of the comparators performed the same or similar job duties as the plaintiff. (Def.'s Brief, p. 14). However this defense cannot hold true for Hobby and Altheide, who performed Plaintiff's exact job, the job she satisfactorily performed for ten (10) years. Summary judgment is due to be denied.

The crucial finding in this analysis is whether the comparable jobs "have a 'common core' of tasks, *i.e.,* whether a significant portion of the two jobs is

34

identical." *Brobst v. Columbus Servs. Int'l,* 761 F.2d 148, 156 (3d Cir.1985). If the jobs share a common core of tasks, the court then inquires as to "whether the differing or additional tasks make the work substantially different." *Id.* And "[g]iven the fact intensive nature of the inquiry, summary judgment will often be inappropriate" in EPA actions. *Id; Mikula v. Allegheny County of Pennsylvania,* 2009 WL 754907, 3 (3rd. Cir. 2009).

### 2.   Plaintiff's Claim of Title VII Sex Discrimination

A.   Plaintiff's Assignment to the Risk Manager position.

> 1.   *Evans was denied an opportunity to apply for the job she had held for ten years and further subjected to an adverse employment decision when she was adversely reassigned to a new position but at the same salary and without any job description, but told to figure it out.*

In order for Evans to establish a *prima facie* case of discrimination for Defendant's failure to promote and/or to transfer her, she must show: (1) she is a member of a protected class; (2) she sought and was qualified for the position; (3) the employer rejected the plaintiff for the transfer (and or promotion); and (4) a person outside of the protected class was hired for the position.  *Id.*  If the plaintiff establishes a prima facie case, it establishes a rebuttable presumption that the employer unlawfully discriminated against the plaintiff.  *U.S. Postal Service Bd. of*

*Governors v. Aikens*, 460 U.S. 711, 714 (1983); *Wilson v. B/E Aerospace, Inc.,* 376 F.3d 1079, 1089 (11th Cir. 2004).

To overcome this presumption, the defendant must articulate a reason, using admissible evidence, to explain why "the plaintiff was rejected, or someone else preferred, for a legitimate, nondiscriminatory reason." *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981).

Should the defendant be able to articulate such a reason, the plaintiff is then given an opportunity to demonstrate that the defendant's stated reason is a pretext for discrimination. This may be accomplished by showing that defendant's proffered explanation is false or "unworthy of credence"; or by trying to prove that he is "clearly better qualified than the person selected for the position." *Burrell v. Dr. Pepper/Seven Up Bottling Group, Inc.*, 482 F.3d 408, 412 (5th Cir. 2007).

The Defendant does not attempt to argue a defense for plaintiff's request to remain in the position she had held for ten years.   However, Tice admitted during his deposition that Evans was equally qualified for the Payroll Manager position as Hobby and that he did not ask Evans if she wanted to take a cut in pay to stay in the position.  (Tice depo., p. 119).  Tice also admitted he did not consider Evans

36

for the Payroll position because Brian Hobby could not do the Risk Manager job.[2]

Because BAM wanted to hire Hobby and put him anywhere, it decided to move

Evans from her position of ten years to a newly created position without a job

description and replace Evans with Hobby.  (Tice depo., p. 119).  This type of

departure from requiring fair consideration of all interested candidates is

"undeniably relevant to the question of discriminatory intent,"  *Krodel v. Young*,

748 F.2d 701, 709 (D.C. Cir. 1984); *Kolstad v. ADA*, 108 F.3d 1431, 1436 (D.C.

Cir. 1997, *reversed on other grounds*, 527 U.S. 26 (1999), and "operates to

discredit the employer's proffered explanation for its employment decision."

*Goostree v. State of Tenn.*, 796 F.2d 854, 861 (6th Cir. 1986); *see*, *also*, *Morrison v.*

*Booth,* 763 F.2d 1366, 1373-74 (11th Cir. 1985) (flexibility in established

---

[2]Hiring a less qualified person can support an inference of discriminatory motivation. See *Alexander v. Fulton County*, 207 F.3d 1303, 1340 (11th Cir. 2000) ("both the Supreme Court and this court have observed that evidence showing an employer hired a less qualified applicant over the plaintiff may be probative of whether the employer's proffered reason for not promoting plaintiff was pretextual"); *Walker v. Mortham*, 158 F.3d 1177, 1190 (11th Cir. 1998) ("The fact that a court may think that the employer misjudged the qualifications of the applicants does not in itself expose him to Title VII liability, although this may be probative of whether the employer's reasons are pretexts for discrimination." (internal marks, emphasis and citation omitted)). Here, Evans had two payroll certifications for the payroll position and had performed the job for ten years.  She had extensive knowledge of the defendant's payroll systems and was told to spend four months training Hobby. (DX16).

procedures introduced subjectivity into employment decisions and must be looked upon with increased scrutiny).

A reasonable jury could conclude from the facts presented in this case that when BAM decided to split Evans' position into two separate positions it knew that Hobby, a new hire, could not do the more complicated risk manager position and sought to favor him with the position held by Evans, but moving Evans without awarding her a salary increase, unlike how males were treated when they advanced in the workplace. When Robert Altheide was awarded the risk manager position several months later, it was with a nice job description and $20,000 more money annually than what Evans was offered. Plaintiff has carried her burden at summary judgment, proved her prima facie case.

Even though the defendant did not articulate a defense, plaintiff has rebutted the presumed defense that plaintiff was awarded a better and more promising position than the one awarded to Hobby. Plaintiff was told only after she trained her replacement for four months would she be provided a job description for the new position. Plaintiff was not treated as Altheide and paid more nor was she considered for the position that Hobby was allowed to move into. Plaintiff had two certifications in payroll but none in risk management. Plaintiff did not meet the criteria for the posting for the risk manager position. (PX12). Payroll was Evans

chosen career path and she considered it adverse to be forced into a new position with no job description, but to be provided only after she had trained her replacement and with no raise, unlike how males were treated. A reasonable jury could find that plaintiff suffered an adverse employment action with the forced transfer. Summary judgment is due to be denied as defendant made no attempt to articulate a defense.

B.   Plaintiff was wrongfully denied her bonus pay in opposition to how similarly situated males were treated.

Using the traditional *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) burden-shifting analysis to evaluate disparate treatment claims, Evans must raise an inference of discrimination through her prima facie case. *Id.* at 802, 93 S.Ct. at 1824. To establish a prima facie case of disparate treatment, Evans must show that: (1) she belongs to a protected class; (2) she was subjected to an adverse job action - in this situation denied her bonus; (3) her employer treated similarly situated employees outside her classification more favorably; and (4) she was qualified to receive the bonus. *Id.(modified in context).*

As articulated above in the EPA argument, plaintiff was entitled to her bonus pay, was denied and told she did not qualify because she missed the deadline by two days. The evidence shows overwhelmingly that the bonus can be manipulated as Tice wants. He had the ability to negotiate the bonus and did. (PX43). He

could award the bonus to males who only worked seven months of the year. (PX20).  But most compelling is his email, prior to even terminating Evans, inquiring as to the amount of Evans' bonus, knowing that if he terminated her prior to March 29, 2007, he could argue the audit committee had not approved the bonuses.  (Tice depo., p. 27).  Plaintiff has proven her prima facie case of discrimination in being denied her $8,000 bonus.  Defendant's defense is barred by collateral estoppel and summary judgment fails.

      C.    <u>The defendant's defense is barred by collateral estoppel</u>

The defendant's argument that Evans engaged in misconduct and refused to work is barred by collateral estoppel.  The United States Supreme Court has "long favored application of the common-law doctrines of collateral estoppel (as to issues) and res judicata (as to claims) to those determinations of administrative bodies that have attained finality." *Astoria Fed. Sav. and Loan Ass'n v. Solimino,* 501 U.S. 104, 107, 111 S.Ct. 2166, 115 L.Ed.2d 96 (1991). *Bailey v. Miltope Corp.,* 513 F.Supp.2d 1232, 1237 (M.D.Ala.,2007). Under Alabama law, which governs the matter of collateral estoppel, *see Marrese v. Am. Acad. of Orthopaedic Surgeons,* 470 U.S. 373, 381-82, 105 S.Ct. 1327, 84 L.Ed.2d 274 (1985), the decisions of administrative agencies may be entitled to preclusive effect if they meet certain conditions. *See Wal-Mart Stores, Inc. v. Smitherman,* 743 So.2d 442,

445 (Ala.1999).  Other courts have given preclusive effect to administrative

decisions in other types of federal employment cases. *See, e.g., Land v. Glover,*

404 F.Supp.2d 1335, 1338-39 (M.D.Ala.2005) (Albritton, J.) (First Amendment

retaliation); *Williams v. Ala. Indus. Dev. Training,* 146 F.Supp.2d 1214, 1222-23

(M.D.Ala.2001) (DeMent, J.) (EEOC retaliation); *Rigby v. Marshall,* 134

F.Supp.2d 1259, 1262-63 (M.D.Ala.2000) (Thompson, J.) (First Amendment

retaliation).

Thus Defendant's reason for Plaintiff's termination, that she abandoned her

job, was not wrongfully terminated, and not entitled to her bonus are issues that

have already been administratively decided to invoke collateral estoppel.  These

issues are not before the court and Defendant cannot rely on the defenses.  The

defendant has attempted to create the issue without informing the court of the

administrative determination.

The defendant attended the hearing before the hearing officer and was fully

heard and presented evidence. Chad Tice, the human resource manager and the

corporate representative in this matter was the person attending and testifying in

the matter.  (PX45; Tice depo., pp. 123-124; see also PX46). The decision of the

hearing officer was not appealed and the unrebutted judicial decision stands. This

is not at issue in this case.

41

At the unemployment hearing, Plaintiff alleged that Defendant wrongfully terminated her when it advertised her position without her knowledge and when she inquired why her position was posted she was told that she was going to change jobs. When plaintiff informed the defendant she did not want to change jobs, she was told she was fired. She was offered a severance package which she refused to sign. These facts were further all listed in the findings of the Administrative Hearing Officer who further specifically found that "[m]isconduct was not established."  (PX45).  Thus, because there is exact identity of issue as is required for collateral estoppel, the Court should give preclusive effect to the hearing officer's determination.  All prerequisites of *Smitherman* have been met and summary judgment is due to be denied.

D.   Plaintiff's pay claims are timely under the Lilly Ledbetter Fair Pay Act

The Defendant alleges Plaintiff's Title VII claims are untimely and further barred because she did not list these in her EEOC charge.  The Lilly Ledbetter Fair Pay Act of 2009, Pub. L. No. 111-2, 2009 S. 181 (2009), with a retroactive effective date of May 28, 2007, altered the limitations period to be applied in wage discrimination cases.  The Act provides that: (1) "an unlawful employment practice occurs, with respect to discrimination in compensation in violation of this title, when a discriminatory compensation decision or other practice is adopted, when an

42

individual becomes subject to a discriminatory compensation decision or other practice, or when an individual is affected by application of a discriminatory compensation decision or other practice, including each time wages, benefits, or other compensation is paid ...."; and (2) "liability may accrue and an aggrieved person may obtain relief ... including recovery of back pay for up to two years preceding the filing of the charge, <u>where the unlawful employment practices that have occurred during the charge filing period are similar or related to unlawful employment practices with regard to discrimination in compensation that occurred outside the time for filing a charge.</u>"[3]  (emphasis added).

According to the terms of the Act, the plaintiff's wage discrimination claims are timely on or after March 27, 2005, two years prior to her EEOC charge

Further, as a general proposition, it is well established that 'the scope of an EEOC complaint should not be strictly interpreted.' *Baxter v. Savannah Sugar Refining Corp.*, 46 F.R.D. 56, 59 (S.D. Ga. 1968). Such a generalization, however, does not answer the more precise question of what standard is to be utilized in measuring the proper scope of a complaint.  In *King v. Georgia Power Co.*, 295

---

[3]  See also, *Bush v. Orange County Corrections Dept.,* 2009 WL 248230, 2 (M.D.Fla.);  See also, *Rehman v. State University of New York at Stony Brook*, 2009 WL 303830, 5 (E.D.N.Y.); *Maher v. International Paper Co.,* 2009 WL 577601, 14 (W.D.Mich. 2009).

F.Supp. 943, (N.D. Ga. 1968),  Judge Smith held that the allegations in a judicial complaint filed pursuant to Title VII 'may encompass any kind of discrimination like or related to allegations contained in the charge and growing out of such allegation during the pendency of the case before the Commission.' 295 F.Supp. at 947. In other words, the 'scope' of the judicial complaint is limited to the 'scope' of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination.  *Sanchez v. Standard Brands, Inc.,* 431 F.2d 455, 465 - 466 (5th Cir. 1970).

The defendant can certainly not argue that it did not realize that pay was an issue in the transfer and reassignment of Evans or that it was not expected to grow from the EEOC charge.  Pay is related to the assignment of any position and is no different in this case.  Summary judgment is due to be denied.

### 3.    Plaintiff's Prima Facie Case of Retaliation

A.    Plaintiff Did Engage in Protected Conduct

Plaintiff can establish a prima facie case of retaliation by showing the following elements: (1) she participated in a protected activity; (2) she suffered a materially adverse employment action; and (3) there is a causal connection between the participation in the protected activity and the adverse employment decision. *Burlington N.E. Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 S. Ct. 2405,

165 L.Ed.2d 345 (2006).  The Defendant contends Plaintiff cannot prove the

transfer is a materially adverse employment action.  The Defendant does not

address the real issue, that Plaintiff was secretively removed from her positions of

ten years and replaced by a male with less qualifications.  That is truly an adverse

action as is the transfer to an undefined job requiring travel to a mother of young

children.  Plaintiff relies on the recent case of *Crawford v. Carroll*, 529 F.3d 961

(11th Cir. 2008).

*Crawford* involved the 4 month denial of a merit increase based on a

retaliatory evaluation.  The increase was subsequently  applied and plaintiff paid

her back pay.  The Eleventh Circuit explained, finding an unfavorable performance

review as materially adverse, that the standard previous in this circuit was more

stringent than the relaxed standard announced in *Burlington*.  "The context of a

Title VII retaliation claim, a materially adverse action "means it well might have

dissuaded a reasonable worker from making or supporting a charge of

discrimination."  529 F.3d 974, citing *Burlington*.  The Court further provided that

an adverse employee review is a materially adverse action that would persuade a

reasonable worker from complaining of discrimination.  The Court, relying on

*Burlington*, suggested "it is for a jury to decide whether anything more than the

most petty and trivial actions against an employee should be considered

45

"materially adverse" to him and thus constitute adverse employment actions."  *Id.* FN13.

Applying the *Crawford* standard to the facts of this case, there is sufficient evidentiary basis to support Evans' retaliation claim.  It is undisputed that upon finding her position posted on the internet she complained about being displaced without her knowledge and further when she was replaced by a male and told she would be reassigned after she trained him she also complained to the point she was sent home for decisionmaking.  It was during this decision making leave that Tice put the wheels in motion to deny Evans her bonus by finding out the amount of the bonus, and having the paperwork completed so he could terminate Evans the next day, two days prior to the board of directors meeting and voting on bonuses.  This is unlike the treatment that Tice states he afforded to Kim Smith who was leaving BAM's employment for another employer.  Tice testified he tried to get Smith to stay and train her replacement and take a week's vacation so her termination date would be after the board meeting.  Because Evans complained about the unfairness in how she was being singled out, she was not afforded her bonus or even to keep her job.

B.      Causal Connection.

The Defendant also argues that the Plaintiff cannot prove a causal link. Courts construe "the causal link element broadly so that 'a plaintiff merely has to prove that the protected activity and the ... [adverse] action are not completely unrelated.' " *Higdon v. Jackson,* 393 F.3d 1211, 1220 (11th Cir.2004) (modifications in original) (citation omitted). Furthermore, a causal connection is established if the plaintiff shows that the decision-maker was aware of the protected activity and the protected activity is not wholly unrelated to the adverse action. *Gupta v. Fla. Bd. of Regents,* 212 F.3d 571, 590 (11th Cir.2000). "For purposes of a prima facie case, 'close temporal proximity' may be sufficient to show that the protected activity and the adverse action were not 'wholly unrelated.'"

Applying the standard to the facts of this case, there is sufficient evidentiary basis to support Evans' retaliation claim.  It is undisputed that Evans complained repeatedly about her position being posted, her male replacement and being reassigned to a position she was not qualified.  Other individuals who had not complained were paid their bonus ahead of the audit and others were paid as the company saw fit to use an employee for its benefit – always holding the bonus to

47

coerce compliance for its unwritten mandates. (Evans Aff. ¶ 5). Summary judgment is due to be denied.

### 4. FMLA interference claim.

It is unlawful for any employer to interfere with, restrain, or deny the exercise, or the attempt to exercise, any right provided by the FMLA. 29 U.S.C. § 2615(a)(1). Plaintiff brings an "interference" claim, "in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the [FMLA]." *Strickland v. Water Works & Sewer Bd. of the City of Birmingham*, 239 F.3d 1199, 1206 (11th Cir.2001). In order to state a claim that his employer has interfered with a substantive FMLA right, a plaintiff must demonstrate that he was entitled to the benefit denied. *See id.* at 1206-07. Plaintiff "does not have to allege that his employer intended to deny the right; the employer's motives are irrelevant." *Id.* at 1208.

"Interfering with" the exercise of an employee's rights would include, for example, not only refusing to authorize FMLA leave, but *discouraging an employee from using such leave.* 29 C.F.R. § 825.220(b) (emphasis added). Plaintiff's evidence does demonstrate actions that rise to the same level that other courts have found may constitute this type of violation of the FMLA. *See, e.g., Saroli v. Automation & Modular Components, Inc.,* 405 F.3d 446, 454 (6th

48

Cir.2005) (employer discouraged employee from exercising her rights under the FMLA when it failed to respond to her inquiries and inform her of her eligibility for leave); *Butler v. IntraCare Hosp. N.,* Civ. No. H-05-2854, 2006 WL 2868942, at *4 (S.D.Tex. Oct.4, 2006) (employer's suggestion that employee work from home rather than take FMLA leave could constitute discouragement); *Solovey v. Wyo. Valley Health Care System-Hospital,* 396 F.Supp.2d 534, 540 (M.D.Pa.2005) (a two-week notice policy discourages employees from taking FMLA leave if the need for the leave is unforeseeable because they could have to go two weeks without pay).

As depicted in her facts and affidavit, Plaintiff has provided sufficient evidence from which a reasonable fact-finder could find that BAM discouraged her from taking leave for the birth of her child.  (Evans Aff., ¶¶ 13-24).  The company told Evans that leave would be unnecessary, that it had determined she would work from home. BAM armed Evans with a laptop and all of the programs necessary for her to complete and handle her day-to-day activities and to process payroll and withholding taxes.  Plaintiff requested to take leave, was denied and further discouraged.  Plaintiff was led to believe is she did not continue working she would not receive her bonus based in part on Evans meeting her annual performance goals.  The Defendant's actions in denying and interfering with

49

Evans' right to FMLA violated the statute.  Summary judgment is due to be denied.

### 5.    Plaintiff's Defamation and Invasion of Privacy Claims

The elements of Evans' cause of action for defamation are: 1) a false and defamatory statement concerning the plaintiff; 2) an unprivileged communication of that statement to a third party; 3) fault amounting at least to negligence on the part of the defendant; and 4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication of the statement.  *McCaig v. Talladega Publ'g Co.*, 544 So.2d 875, 877 (Ala.1989). *Wal-Mart Stores, Inc. v. Smitherman,* 872 So.2d 833, 840 (Ala.2003).

The Defendant contends that Evans case fails because she did not plead special damages in her complaint.  "Special damages are the material harms that are the intended result or natural consequence of the slanderous statement, see *Harrison v. Burger*, 212 Ala. 670, 103 So. 842, 844 (1925), and the general rule is that they are limited to 'material loss capable of being measured in money,' Restatement (2d) of Torts § 575, cmt. b, at 198." See also *Butler v. Town of Argo* 871 So.2d 1, 18 (Ala. 2003).

Further, the Defendant, through its actions, has placed the Plaintiff in a false light and therefore, invaded her privacy by spreading false and malicious gossip,

which is different than *slander per quod* in that the Plaintiff does not have to prove actual monetary damages.

While Plaintiff provided in her complaint, Count VI as defamation, she specifically pled the elements of invasion of privacy as found in *Casey v. McConnell*, 975 So.2d 384 (2007).

"Alabama has long recognized that a wrongful intrusion into one's private activities constitutes the tort of invasion of privacy." *Butler*, 871 So.2d at 12. It is generally accepted that invasion of privacy can be independently established by four limited and distinct wrongs, including: "'(1) intruding into the plaintiff's physical solitude or seclusion; (2) giving publicity to private information about the plaintiff that violates ordinary decency; (3) <u>putting the plaintiff in a false, but not necessarily defamatory, position in the public eye</u>; or (4) appropriating some element of the plaintiff's personality for a commercial use.'" *Ex parte Birmingham News, Inc.*, 778 So.2d 814, 818 (Ala. 2000) (quoting *Johnston v. Fuller*, 706 So.2d 700, 701 (Ala. 1997)).

*In Carter v. Innisfree Hotel, Inc.*, 661 So.2d 1174 (Ala.1995), the Alabama Supreme Court explained how an individual may commit the tort of invasion of privacy by intruding into another's physical solitude or seclusion--the first branch of invasion of privacy enumerated in *Butler*:

"One may invade another's privacy through either an intrusion upon a physical space, such as a trespass, or by an invasion of one's 'emotional sanctum'; the law prohibits a wrongful intrusion into either of these areas of privacy. *Phillips v. Smalley Maint. Servs.*, *Inc.*, 435 So.2d 705, 708 (Ala. 1983). In defining the invasion of privacy tort, the Phillips Court quoted comment b to Restatement (Second) of Torts § 652B (1977):

"'The invasion may be physical intrusion into a place in which the plaintiff has secluded himself, as when the defendant forces his way into the plaintiff's room in a hotel or insists over the plaintiff's objection in entering his home. It may also be use of the defendant's senses, with or without mechanical aids, to oversee or overhear the plaintiff's private affairs, as by looking into his upstairs window with binoculars or tapping his telephone wires. It may be by some other form of investigation or examination into his private concerns....'" 661 So.2d at 1178 (emphasis added). Moreover, in *Butler*, the Alabama Supreme Court noted what must be established to prove a "false light" claim--the third branch of invasion of privacy enumerated in *Butler*:

Applying Restatement (Second) of Torts § 652E (1977) and the following comments, this Court has adopted the following definition for 'false light' invasion of privacy:

"One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if (a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed." *Schifano v. Greene County Greyhound Park, Inc.*, 624 So.2d 178, 180 (Ala. 1993) (emphasis omitted) (quoting Restatement (Second) of Torts § 652E (1977)).

Alabama has long recognized that a wrongful intrusion into one's private activities constitutes the tort of invasion of privacy.  The plaintiff was terminated by the defendant after ten years of employment.  The defendant then called a meeting of plaintiff's co-workers and addressed that Evans had left BAM for "family reasons."  This was incorrect.  Defendant terminated the Plaintiff. Thereafter, plaintiff's co-workers called to inquire what was wrong with her newborn and why was Evans leaving the company for family reasons.  Plaintiff was then forced to share the painful news that she had been terminated by the defendant and replaced with a male with no experience and no seniority.  This malicious contention and the spreading of false information, placed plaintiff in a false and embarrassing light.  This conduct is similar to the conduct that the

53

defendant portrayed in serving plaintiff's new employer, Energen, with a subpoena for employment records within her first 30 days of probationary employment.

Courts have found that by issuing a subpoena to plaintiff's current employer, defense counsel caused plaintiff to worry about her continued employment relationship, in a manner amounting to harassment. Because of the direct negative effect that disclosures of disputes with past employers can have on present employment, subpoenas in this context, if warranted at all, should be used only as a last resort. *Conrod v. Bank of New York*, 1998 U.S. Dist. LEXIS 11634 at * 5 (S.D.N.Y. 1998). "The spirit of [26(g)] is violated when discovery is used as a tactical weapon rather than to explore a party's claims and the facts connected therewith." *In re Weinberg*, 163 B.R. 681, 684 (Bankr. E.D.N.Y. 1994) (internal citation omitted). The same is true with respect to third-party subpoenas issued in the early discovery phase of a discrimination litigation. *Conrod* at *5 . The court sanctioned the defendant for subpoenaing the plaintiff's current employer without first attempting other methods of seeking such information. Id. at *6 n3. Summary judgment is due to be denied as to Plaintiff's claim of defamation and invasion of privacy.

**V.     CONCLUSION**

Plaintiff has proven her *prima facie* case for all of her claims.  Plaintiff is entitled to a denial of summary judgment on all her claims in that she has established Defendant's reasons are pretextual and unworthy of belief.

For all the reasons cited above, Defendant's Motion for Summary Judgment is due to be denied.  Evans submits that the facts and applicable law set forth herein preclude the granting of Defendant's Motion for Summary Judgment as Evans has presented to the court genuine issues of material fact.

WHEREFORE, PREMISES CONSIDERED, the Plaintiff moves this Honorable Court to deny Defendant's Motion for Summary Judgment in its entirety.

Respectfully submitted,


/s/ Alicia K. Haynes
Alicia K. Haynes
Attorney for Plaintiff

**OF COUNSEL:**

**HAYNES & HAYNES, P.C.**
1600 Woodmere Drive
Birmingham, Alabama   35226
Phone:  (205) 879-0377
Fax:  (205) 879-3572
E-mail:  akhaynes@haynes-haynes.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 30th day of March 2009, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Albert L. Vreeland, II.
Lehr Middlebrooks & Vreeland, P.C.
P.O. Box 11945
Birmingham, Alabama 35202-1945


/s/ Alicia K. Haynes
OF COUNSEL