## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **TONDALAYA EVANS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. CV-07-S-2172-S** |
| | ) | |
| **BOOKS-A-MILLION,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

This is an action in which the plaintiff, Tondalaya Evans, alleged claims against her former employer, Books-A-Million, under four federal statutes: *i.e.*, the Equal Pay Act of 1963, 29 U.S.C. § 206(d)(1); Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*.; the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 *et seq*.; and, the Consolidated Omnibus Budget Reconciliation Act of 1985, 29 U.S.C. § 1161 *et seq*.[1]  The case originally was assigned to Magistrate Judge John E. Ott pursuant to 28 U.S.C. § 636(b).  Judge Ott subsequently filed a lengthy report in which he recommended that the defendant's motion for partial summary judgment be granted, and that defendant's motion to strike portions of the declaration submitted by plaintiff in opposition to summary judgment be granted in part and denied in part.[2]

---

[1] The complaint also contained claims under Alabama law for defamation, libel, and slander.

[2] *See* doc. nos. 17 (Defendant's Motion for Partial Summary Judgment), 24 (Defendant's Motion to Strike Portions of Plaintiff's Declaration Submitted in Opposition to Summary Judgment) and 25 (Magistrate Judge's Report and Recommendation).

The action then was reassigned to the undersigned judicial officer for all further proceedings.[3]

Following consideration of the objections to the Magistrate Judge's report and recommendation filed by plaintiff,[4] the parties' briefs and evidentiary submissions, and an independent review of the entire file, this court entered a memorandum opinion and order ratifying the Magistrate Judge's recommendations, and dismissing all of the plaintiff's claims, *except for* her claim based upon the Consolidated Omnibus Budget Reconciliation Act.[5]  The case now is ripe for decision following a bench trial on that claim.

## I.  INTRODUCTION

The Consolidated Omnibus Budget Reconciliation Act, generally referred to by the acronym "COBRA," was enacted by Congress during 1985, but not signed into law by President Reagan until April 7, 1986.[6]  Among other things, the Act requires "qualifying employers" (generally defined as those persons or entities who or which

---

[3] *See* doc. no. 26 (Order Reassigning Case).

[4] *See* doc. no. 27 (Plaintiff's Opposition and Objections to Report and Recommendation of Magistrate Judge).

[5] *See* doc. nos. 29 (Memorandum Opinion) and 30 (Order).  Defendant did not move for summary judgment on plaintiff's COBRA claim.

[6] Although the Act only became law on April 7, 1986, when signed by President Reagan, its official name is "the Consolidated Omnibus Budget Reconciliation Act of 1985."  *See* Pub. L. 99-272, 100 Stat. 82.  Due to the discrepancy between the official name of the Act and the year in which it was signed into law, some governmental publications refer to the Act as the Consolidated Omnibus Budget Reconciliation Act of *1986.*

employed twenty or more full-time equivalent employees during the previous calendar year) to offer "qualified employees" (and members of the employee's immediate family) the option to continue coverage under the employer's group health and dental insurance plans whenever a "qualifying event" causes the employee to lose such coverage. *See* 29 U.S.C. § 1161; *see also*, *e.g.*, *Brown v. Neely Truck Line, Inc.*, 884 F. Supp. 1534, 1539 (M.D. Ala. 1995). Examples of some of the "qualifying events" listed in the statute include a person's loss of group health or dental insurance coverage due to: (1) the death of the covered employee; (2) a divorce or legal separation of the covered employee that terminates the ex-spouse's eligibility for benefits; (3) a dependent child attaining the age at which she or he is no longer eligible for coverage under the employer's group plans; or (4), as in the present case, the voluntary or involuntary termination of a covered employee for any reason other than "gross misconduct." *See* 29 U.S.C. § 1162(2); *Brown*, 884 F. Supp. at 1539; *Lloynd v. Hanover*, 72 F. Supp. 2d 469, 478 (D. Del. 1999).[7] COBRA requires that the continuation coverage offered to the qualified employee extend at least eighteen months past the date of the "qualifying event." 29 U.S.C. § 1162(2)(A)(i).

---

[7] Defendant neither argued nor presented evidence that the termination of plaintiff's employment was the result of "gross misconduct." Hence, Tondalaya Evans was a qualified employee covered under Books-A-Million's group dental insurance plan, and she thereby was entitled to receive the notice required by statute.

In addition to requiring that the qualified employee be given the option to extend coverage under the employer's group health or dental insurance plans for at least eighteen months past the date of a "qualifying event," COBRA also mandates that the employee be given *notice* of his or her option to do so. *See* 29 U.S.C. 1166. The employer must notify the health plan administrator within thirty days of the "qualifying event" that triggered the termination of the group health or dental insurance coverage of the employee; and, the health plan administrator must then notify the employee of his or her option for extended coverage within an additional fourteen days. *See* 29 U.S.C. §§ 1166(a)(1)-(2), 1166(a)(4), 1166(c); *see also* 29 C.F.R. §§ 2590.606-2(b), 2590.606-4(b)(1). When, as here, the defendant-employer also is the administrator of the group health and dental insurance plans, those two periods are added together; in other words, the employer/plan administrator is allowed a total of forty-four days within which to provide notice to the former employee. *See* 29 C.F.R. § 2590.606-4(b)(2).

If the former employee is not provided the required notice within the time allowed by statute, he or she is afforded a private right of action. *See* 29 U.S.C. § 1132(c)(1). Hence, this suit.

## II.  FINDINGS OF FACT

### A.    Plaintiff's Employment, Termination, and Insurance Coverage

4

Plaintiff, Tondalaya Evans, began work at Books-A-Million ("BAM") in November 1997 as a staff accountant, and; she was promoted to the position of Payroll and Insurance Manager in 2000.[8]  For reasons that were not directly at issue during trial, plaintiff's employment with BAM ended on March 27, 2007.[9]

BAM offered group health and dental insurance benefits to its employees through Blue Cross/Blue Shield of Alabama.[10]  At the time of her termination, plaintiff was not covered by BAM's group health insurance plan, but she did maintain dental insurance coverage under BAM's group plan.[11]  She continued to receive dental coverage through BAM until May 30, 2007: two months after her employment ended.[12]  Plaintiff remained unemployed until October 22, 2007, when Bruno's Supermarkets, LLC ("Bruno's") hired her as a Payroll Supervisor.[13] During the nearly five months that plaintiff was not employed, she did not have dental insurance

---

[8] Doc. no. 35 (Statement of Agreed and Disputed Facts) ¶¶ 1-2; *see also* Trial Tr. 13, 120-21, Aug. 27, 2012.

[9] Doc. no. 35 (Statement of Agreed and Disputed Facts) ¶ 10; *see also* Trial Tr. 121, Aug. 27, 2012.  Note that employees who are terminated for "gross misconduct" are not entitled to a COBRA notice or extension of benefits.  *See* 29 U.S.C. §§ 1163(2), 1166(a)(4)(A).  However, at trial, BAM offered no evidence to suggest that plaintiff's termination was due to gross misconduct and, therefore, the exact nature of her termination is not relevant to her right to receive COBRA notice.  Indeed, BAM Vice President Chad Tice admitted that plaintiff was entitled to the notice.  Trial Tr. 43, Aug. 27, 2012.

[10] Trial Tr. 9, Aug. 27, 2012.

[11] Doc. no. 35 (Statement of Agreed and Disputed Facts) ¶ 9; *see also* Trial Tr. 126-27, Aug. 27, 2012; Pl.'s Trial Ex. 14.

[12] Doc. no. 35 (Statement of Agreed and Disputed Facts) ¶ 11.

[13] *Id.* at ¶ 12; *see also* Trial Tr. 128-29, Aug. 27, 2012; Pl.'s Trial Ex. 18.

5

coverage; nevertheless, she did not incur any dental bills during that period.[14]  Plaintiff obtained dental insurance coverage that was comparable to her benefits under BAM's plan through her employment with Bruno's on December 1, 2007:[15]  *i.e.*, eight months after the end of her employment with BAM, and slightly more than a month after her employment by Bruno's.

## B.    BAM's Managerial Structure and COBRA Notification Process

The relevant managerial structure of BAM during 2007 consisted of the following positions: Vice President of Loss Prevention and Human Resources; Benefits Manager; and Benefits Coordinator.[16]  Chad Tice served as the Vice President of Loss Prevention and Human Resources.[17]  One of his duties was to oversee the individual who managed insurance benefits, *i.e.*, the Benefits Manager. Kathryn Roberts was the Benefits Manager in 2007.[18]

As Benefits Manager, Ms. Roberts' primary duty was to supervise the administration of company benefits, including 401k plans, and group medical, life,

---

[14] Trial Tr. 130, Aug. 27, 2012.

[15] Doc. no. 35 (Statement of Agreed and Disputed Facts) ¶ 13.

[16] *See* Trial Tr. 6-8, 40-41, 144, Aug. 27, 2012.

[17] *Id.* at 40-41.

[18] *Id.* at 6-8, 41.  Ms. Roberts was called to the witness stand as Kathryn King, but her current name is Kathryn Roberts.  *See id.* at 5-6.  The parties and the witnesses use both last names at various times, but for consistency and simplicity this court will refer to the witness as Ms. Roberts.

disability, and dental insurance coverages.[19]  Two positions reported directly to Ms. Roberts.  One of them was the Benefits Coordinator.[20]  Starting in March 2007, Ms. Kerry Law occupied that position.[21]  As Benefits Coordinator, Ms. Law enrolled employees in benefit plans, and prepared COBRA notices for persons who left the employment of BAM.[22]

BAM's process for determining those employees who were due to receive notice of their right to extend group insurance coverages for a period of eighteen months following the termination of their employment with BAM was unwieldy. Kerry Law manually cross-referenced three different lists in order to determine those employees who should be notified of their rights under COBRA.  The first list, called the "blue bar report," was generated by Blue Cross/Blue Shield.[23]  The blue bar report listed the names of BAM's employees who were covered under the various group plans insured by Blue Cross/Blue Shield.[24]  Because the blue bar report "identified every participant that Blue Cross had  [on] their account" — *i.e.*, about 1,500

---

[19] *Id.* at 6-7.

[20] *Id.* at 7.

[21] *Id.* at 144.

[22] Trial Tr. 144, Aug. 27, 2012.

[23] *Id.* at 8, 26, 145.

[24] *Id.* at 10, 145, 154.

employees on the medical plan and another 1,600 on the dental plan — it was "quite cumbersome" and, inevitably, several inches thick.[25]

The second list, known as a "termination report,"[26] listed the name of every employee who had ceased employment with BAM, voluntarily or involuntarily, during the previous month.[27] Kerry Law personally generated and printed that report from data maintained on BAM's computer system.[28]

The third list, known as the "premium report,"[29] identified those employees who had paid insurance premiums through payroll deductions.[30] Apparently, Kerry Law also generated and printed the premium report from data maintained on BAM's computer system, although the testimony was less than clear on that point[31]

In any event, once all of those documents — the blue bar report, the termination report, and the premium report — were compiled, it was Kerry Law's responsibility to manually cross-reference the names listed on each report, determine the BAM employees who should receive a COBRA notice, and then type and mail the notices.[32]

---

[25] *Id.* at 26-27.

[26] *See*, *e.g.*, *id.* at 145.

[27] *Id.* at 154-55.

[28] Trial Tr. 156, Aug. 27, 2012.

[29] *See*, *e.g.*, *id.* at 145, 153, 158

[30] *See id.* at 26, 153, 158.

[31] *See id.* at 8, 26.

[32] *Id.* at 8, 11, 26-27, 144-45, 157-58.

The inefficient, unwieldy process occurred every month.[33]  Despite being Ms. Law's direct supervisor by virtue of her position as Benefits Manager, Kathryn Roberts repeatedly confessed that she did not know how BAM maintained records indicating that an employee had received the COBRA notice required by statute.[34]

## C.    BAM's Nonexistent COBRA Notice to Plaintiff

Sometime after her termination, plaintiff placed a telephone call to Vice President Chad Tice and told him that she had not yet received her COBRA notice (*i.e.*, the paperwork necessary to extend her dental insurance coverage for up to eighteen months).[35]  At trial, Kerry Law admitted that she initially failed to send out a notice to the plaintiff,[36] and Vice President Tice admitted that plaintiff was entitled to receive such a notice.[37]

BAM employees offered contradictory accounts of what happened after plaintiff telephoned Vice President Chad Tice.  Tice testified that he went directly *to Kerry Law*, rather than to Kathyrn Roberts, his immediate subordinate, and told Ms. Law that plaintiff's COBRA notice should be mailed as quickly as possible.[38]  Tice attributed the fact that plaintiff had not received her statutory COBRA notice to "a

---

[33] *Id.* at 27.

[34] Trial Tr. 11-12, Aug. 27, 2012.

[35] *Id.* at 46-47.

[36] *Id.* at 145, 147-48.

[37] *Id.* at 43.

[38] *Id.* at 47, 82.

clerical error from a new employee,"[39] *i.e.*, Ms. Law.  Tice acknowledged that his staff was never able to find evidence that *any* notice was ever mailed to plaintiff, either before or after her telephone call to him.

In contrast to Vice President Tice's testimony, Benefits Manager Kathryn Roberts claimed that Tice approached *her* after plaintiff's telephone call, and instructed *her* to ensure that plaintiff's COBRA notice was mailed.[40]  Ms. Roberts did not send the notice herself, but instead delegated that task to her subordinate, Benefits Coordinator Kerry Law.[41]  Ms. Roberts recognized that the matter was important, however, because Vice President Tice personally sought her out.[42]  Nevertheless, and despite the fact that Kerry Law — one of only two employees supervised by Kathryn Roberts — was new to the Benefits Coordinator position and not familiar with BAM's cumbersome COBRA notification process,[43] Kathryn Roberts never followed up on the matter.[44]  Her only explanation for not doing so was:  "I guess I'm not a micromanager."[45]  Like Vice President Tice, Ms. Roberts was not able to find any

---

[39] *Id.* at 66.

[40] *Id.* at 23-25.

[41] *Id.* at 23-24.

[42] *Id.* at 38.

[43] *Id.* at 33-36.

[44] *Id.* at 26.

[45] Trial Tr. 35, Aug. 27, 2012.

evidence establishing that a COBRA notice had been mailed to or received by plaintiff.[46]

For her part, Kerry Law initially testified that it was Kathryn Roberts, and not Vice President Chad Tice, who approached her about plaintiff's COBRA notice.[47] Upon further questioning, however, Ms. Law stated that Tice *did* approach her about the issue, but only after Kathryn Roberts had talked to her.[48]  Ms. Law maintained that she mailed plaintiff a COBRA notice after being specifically instructed to do so, but she also admitted that she did not have a clear memory of doing so, nor could she find the certified mail receipt that should have accompanied the mailing.[49]  Ms. Law acknowledged that it was important to keep a copy of the COBRA notice mailed to former employees like plaintiff, and the accompanying certified mail receipt, but she did not do so.[50]  Her explanation for these derelictions and omissions was that she had only been Benefits Coordinator for a few weeks, and "was new to everything and very overwhelmed."[51]

---

[46] *Id.* at 12-13, 37-38

[47] *Id.* at 145-47.

[48] *Id.* at 161.

[49] *Id.* at 146-48.

[50] *Id.* at 162.

[51] Trial Tr. 148, Aug. 27, 2012.

Plaintiff's uncontroverted testimony established that she never received a COBRA notice from BAM:[52] a fact that is corroborated by BAM's inability to produce even a scintilla of evidence that the notice was ever mailed.

Moreover, as this court stated at the conclusion of trial, "there are too many contradictions and evasions and disingenuous answers" from BAM's employees "to credibly conclude that [the company's failure to mail plaintiff the notice required by COBRA] was inadvertent."[53]

Other facts, not directly relevant to the COBRA notice, also shed light on the credibility of BAM and its employees.  Vice President Tice's answers at trial were oftentimes conveniently forgetful or evasive.[54]  When an issue arose as to whether plaintiff was entitled to a bonus during the last months of her employment, Tice was stubbornly unwilling to provide a copy of BAM's policy stating the prerequisites for the bonus, despite plaintiff's repeated requests for a copy.[55]

---

[52] *Id.* at 169.  Plaintiff explicitly testified: that she never received the notice, whether via regular or certified mail; that no member of her family ever received the notice; and that she never refused a letter from BAM.  *Id.* at 125-26.

[53] *Id.* at 171; *see also id.* at 172 ("I am not impressed with the way that the defendant handled this situation, which may be the understatement of this year.").

[54] *See*, *e.g.*, *id.* at 47-50.

[55] Trial Tr. 58-64, Aug. 27, 2012; Pl.'s Trial Ex. 8 (Emails of Mar. 29-30, 2007).  At trial, after being questioned explicitly about the company "policy," Tice asserted that BAM's bonus payment policy is not *really* a policy, but rather a document that employees signed.  Trial Tr. 60-61, Aug. 27, 2012.  One BAM employee noted in an email to Tice that she probably had "the piece of paper that [Ms. Evans] signed," Pl.'s Trial Ex. 8 (Email from Sandi Meeks to Chad Tice, Mar. 29, 2007 (07:23 CST)), but Tice said that BAM could not find that document.  Trial Tr. 61-62, Aug. 27, 2012.

The circumstances surrounding plaintiff's bonus are especially suspicious, particularly when contrasted to the situation of Ms. Sandi Meeks, who was BAM's Director of Finance in 2007.[56] Ms. Meeks's employment with BAM ended in March 2008,[57] approximately a year after that of the plaintiff. Ms. Meeks testified that, in order to receive a bonus, BAM employees had to be employed on the date the bonus checks were issued, usually in April.[58] Yet, Ms. Meeks received her bonus in 2008, even though she left her employment with the company in March 2008.[59] Compare that result with plaintiff's situation. While the parties agree that plaintiff's employment with BAM ended on March 27, 2007,[60] internal BAM documents introduced at trial indicate that her effective date of termination was April 23, 2007.[61] Thus, plaintiff's case for receiving her bonus seems as least as strong as Ms. Meeks's, regardless of whether bonus payments were triggered in April (as Ms. Meeks claims)

---

[56] Trial Tr. 83, Aug. 27, 2012.

[57] *Id.* at 83-84.

[58] *Id.* at 91-94. Vice President Tice explained that the bonus payment date, "approximately March 17th," is determined by the date that the BAM Audit Committee meets. *Id.* at 54; *see also* Pl.'s Trial Ex. 8. Tice noted that 2007 was a 53-week, rather than a 52-week, fiscal year, and therefore seven days must be added to the standard, March 17th date, resulting in bonus payments on "approximately" March 24th. *Id.* at 54-55. Of course, Ms. Evans was still a BAM employee on that date (and thus would have been entitled to her bonus); when pressed that point, Tice testified that the board did not meet until March 29, 2007. *Id.* at 55. The court found this sequence of dates to be "strange," and noted that "[t]here are a series of things that are happening in this case . . . were it's just a day or two difference." *Id.*

[59] *Id.* at 83, 94.

[60] Doc. no. 35 (Statement of Agreed and Disputed Facts) ¶ 10; *see also* Trial Tr. 121, Aug. 27, 2012.

[61] Trial Tr. 100, Aug. 27, 2012; Pl.'s Trial Ex. 11.

13

or in mid- to late-March (as Vice President Tice claims).[62]  Yet Tice was firm in his commitment against paying a bonus to plaintiff.[63]

In sum, the uncontroverted evidence shows that plaintiff never received a COBRA notice from BAM.  The overwhelming weight of the evidence clearly demonstrates that BAM's contention that the failure to mail plaintiff a notice was an "innocent mistake" lacks credibility.  The court therefore finds that BAM intentionally withheld plaintiff's COBRA notice.

### III.  CONCLUSIONS OF LAW

BAM's pre-trial brief,[64] as well as Vice President Tice's testimony at trial (in which he admitted that plaintiff was entitled to receive a COBRA notice),[65] makes clear that BAM was bound by the notice requirements discussed in Part I of this opinion.  The parties' post-trial briefs are in agreement on these points:  BAM was both the employer and plan administrator,[66] and obligated to provide plaintiff a COBRA notice within 44 days of her termination.  Finally, as discussed in Part II, *supra*, there was absolutely no evidence that BAM sent, or that plaintiff received, her

---

[62] *See supra* note 55.

[63] Pl.'s Trial Ex. 8 (Emails between Chad Tice and Tondalaya Evans, Mar. 29-30, 2007).

[64] *See* doc. no. 40 (Defendant's Trial Brief), at 1-4.

[65] Trial Tr. 43, Aug. 27, 2012.

[66] Doc. no. 43 (Plaintiff's Post-Trial Brief), at 3; doc. no. 48 (Defendant's Post-Trial Brief), at 1-2; *see also* Trial Tr. 10-11, Aug. 27, 2012.

COBRA notice; instead, this court finds that defendant intentionally withheld that notice.

## A.   Statutory Penalty

Having failed to meet its obligation to provide plaintiff notice of her right to continue dental insurance coverage (and the forms necessary to do so), BAM is subject to a statutory penalty. *See* 29 U.S.C. § 1132(c)(1). The decision to impose the penalty, as well as "such other relief" as may be deemed proper, is committed to the discretion of the court. *Id.* Specifically, the court may fine BAM up to $110 per day from the date of BAM's failure or refusal to issue the notice. *Id.*; 29 C.F.R. § 2572.502c-1. Finding ample justification for the imposition of a statutory penalty, three issues remain: the date on which the penalty begins to run; the date on which the penalty ends; and the daily amount of the penalty.

### 1.   The date on which a penalty begins to run

The parties agree that the penalty period commences on the 45th day after the qualifying event (plaintiff's March 27, 2007 termination): *i.e.*, May 11, 2007.[67] *See* 29 U.S.C. §§ 1166(a)(1)-(2), 1166(a)(4), 1166(c); 29 C.F.R. §§ 2590.606-2(b), 2590.606-4(b)(1)-(2).[68]

---

[67] Doc. no. 43 (Plaintiff's Post-Trial Brief), at 2-5; doc. no. 48 (Defendant's Post-Trial Brief), at 1-2; Doc. no. 50 (Plaintiff's Post-Trial Reply Brief), at 1 n.1.

[68] As discussed in Part I of this opinion, *supra*, the law afforded BAM a total of forty-four days to generate and mail a COBRA notice to plaintiff, and every day thereafter triggered the penalty.

## 2.     The penalty ending date

At first blush, the parties disagree on the ending date of the penalty period. Plaintiff's post-trial brief observes that courts have used a variety of end dates to calculate the penalty: *e.g.*, the date of the court's judgment; the eighteen-month period during which COBRA coverage could have continued; the date of the filing of the plaintiff's complaint; or some other significant date, such as the date on which a plaintiff admits that he or she would have discontinued COBRA coverage.[69] Ultimately, however, plaintiff proposes an end-date of August 27, 2012: *i.e.*, the date of trial, which would result in a penalty period of over five years.[70]

In response, BAM argues that the penalty period should terminate on one of the followings dates:  the date plaintiff filed suit (November 30, 2007);[71] or the date on which plaintiff obtained comparable dental coverage through her employment with Bruno's (December 1, 2007); or the conclusion of the eighteen-month period during which COBRA coverage could have continued (September 27, 2008).[72]

### a.     Plaintiff's argument regarding the penalty end-date

Notably, plaintiff's *pre-trial* list of damages presented a distinctly different position on the penalty end-date than her *post-trial* brief.  In her pre-trial brief,

---

[69] Doc. no. 43 (Plaintiff's Post-Trial Brief), at 6-7.

[70] *Id.* at 15.

[71] Doc. no. 48 (Defendant's Post-Trial Brief), at 2-3.

[72] *Id.* at 3-5.

plaintiff approvingly and extensively quoted from *Rodriguez v. International College of Business and Technology, Inc.*, 364 F. Supp. 2d 40 (D. P.R. 2005), as demonstrative of "the way to calculate the penalty."[73]   The pertinent passage from plaintiff's pre-trial brief reads as follows:

> Statutory penalties are generally calculated from the last date on which the plan administrator could have sent notice *until the end of the continuation coverage period.  See*[,] *e.g.*, *Lloynd v. Hanover Foods Corp.*, 72 F. Supp. 2d 469 (D. Del. 1999). . . . In the case at bar, the qualifying event occurred on June 18, 2003.  From this date [defendant] had forty-four (44) days to notify [plaintiff] of his right to continue coverage under the group health plan. *See Gonzalez Villanueva v. Lambert*, 339 F. Supp. 2d 351, 358-59 (D.P.R. 2004).  Therefore, the clock began to tick on August 2, 2003 (the forty-fifth day after the qualifying event) *and stopped on* December 18, 2004, (*eighteen months after the qualifying event which constitutes the maximum period of the continuation coverage allowed under COBRA*).[74]

It was only after the conclusion of trial, *and after the court orally indicated that it would rule in plaintiff's favor*, that plaintiff argued that the penalty period terminus should be the date of trial: an end-date that would more than triple the penalty period she originally urged upon the court.

### i.   Judicial estoppel

The doctrine of *judicial estoppel* "prevents a party from contradicting previous declarations made during the same or an earlier proceeding if the change in position

---

[73] Doc. no. 37 (Plaintiff's Damages List for Trial), at 6.

[74] *Id.* (quoting *Rodriguez v. Int'l College of Bus. & Tech.*, 364 F. Supp. 2d 40, 50 (D. P.R. 2005) (emphases and alternations supplied)); *see also* 29 U.S.C. § 1162(2)(A)(i)

would adversely affect the proceeding or constitute a fraud on the court." *Black's Law Dictionary* 590-91 (8th ed. 2004). The doctrine is an equitable one vested within the court's discretion, and its purpose is to protect the integrity of the judicial process. *New Hampshire v. Maine*, 532 U.S. 742, 749-50 (2001); *Stephens v. Tolbert*, 471 F.3d 1173, 1177 (11th Cir. 2006); *Transamerica Leasing v. Institute of London Underwriters*, 430 F.3d 1326, 1335 (11th Cir. 2005). Judicial estoppel accomplishes its purpose by "prohibiting parties from deliberately changing positions according to the exigencies of the moment." *New Hampshire*, 532 U.S. at 750 (citations omitted); *see also Robinson v. Tyson Foods, Inc.*, 595 F.3d 1269, 1273 (11th Cir. 2010); *Burnes v. Pemco Aeroplex, Inc.*, 291 F.3d 1282, 1285 (11th Cir. 2002).

"The seminal case in the Eleventh Circuit on the theory of judicial estoppel is *Burns v. Pemco Aeroplex, Inc.*, 291 F.3d 1282 (11 Cir. 2002)." *Robinson*, 595 F.3d at 1273. The *Burns* court observed that judicial estoppel combats "the calculated assertion of divergent sworn positions," and thereby prevents "parties from making a mockery of justice by *inconsistent pleadings*." *Burns*, 291 F.3d at 1285 (emphasis supplied). *Burns* outlined two primary guideposts: first, the allegedly inconsistent positions must be sworn; and second, such inconsistencies must be shown to have been calculated to make a mockery of the judicial system. *Id.*; *Robinson*, 595 F.3d at 1273. "[T[hese two enumerated factors are not inflexible or exhaustive; rather, courts

18

must always give due consideration to all the circumstances of a particular case when considering the applicability of this doctrine." *Burns*, 291 F.3d at 1286.

Clearly, plaintiff has taken inconsistent positions. Before trial, she argued that "the way to calculate the penalty" was to stop counting at the end of the eighteen-month period during which COBRA coverage could have continued. After trial, she asserted that the penalty ends on the date of trial. Plaintiff's pre- and post-trial filings were submitted under Federal Rule of Civil Procedure Rule 11(b), yet both present their respective, contradictory arguments as controlling. Absent some intervening authority, the two contradictory positions cannot govern the same issue. Plaintiff referenced no such intervening authority. Instead, her post-trial brief cited the very authority (*Rodriguez*) she had relied upon as authoritative in her pre-trial filing, before eventually disregarding the *Rodriguez* methodology in favor of a significantly later penalty end-date.[75]

The timing of plaintiff's inconsistent positions also indicates that her change of position was an effort to game the judicial system, in order to multiply, by a factor of roughly three, the amount of her recovery. It would be one thing if plaintiff's position had changed before trial, or in light of intervening authority. But that is not the situation. Here, plaintiff "deliberately chang[ed] positions according to the exigencies

---

[75] *Compare* doc. no. 37(Plaintiff's Damages List for Trial), at 6 *with* doc. no. 43 (Plaintiff's Post-Trial Brief), at 6, 15 *and* doc. no. 50 (Plaintiff's Post-Trial Reply Brief), at 4-5.

of the moment." *New Hampshire*, 532 U.S. at 750 (citations omitted); *see also*
*Robinson*, 595 F.3d at 1273; *Burnes*, 291 F.3d at 1285.  When, prior to trial, it was
unclear which way the court would decide the COBRA issue, plaintiff argued an
eighteen-month endpoint, which would result in a significant, but reasonable, penalty
period.  After the court orally announced at the conclusion of trial its decision in favor
of plaintiff, as well as its displeasure with BAM, plaintiff increased the end-date by
approximately four years.  Such conduct should not, and will not, be tolerated by this
court.

> **b.     BAM's argument regarding the penalty end-date**

As previously noted, BAM offered three possible end-dates in order of
descending preference:  the date plaintiff filed suit (November 30, 2007); the date
upon which she obtained comparable dental coverage through her employment with
Bruno's (December 1, 2007); or the conclusion of the eighteen-month period during
which COBRA coverage could have been continued (September 27, 2008).[76]

Notably, both parties agree that the eighteen-month period during which
COBRA coverage could have continued provides a permissible cut-off date.
Nevertheless, the court will address the other two dates proposed by BAM.

---

[76] Doc. no. 48 (Defendant's Post-Trial Brief), at 2-5.

BAM relies on *Middleton v. The Russell Group, Ltd.*, 1998 U.S. Dist. LEXIS 6126 (M.D. N.C. 1998), as support for its argument that the date on which plaintiff filed suit is the most appropriate end-date.[77]  The justification for the holding in *Middleton* was that "it would make little sense to expect or require the giving of COBRA notice during litigation over [the issue of] whether notice is legally required." *Middleton*, 1998 U.S. Dist. LEXIS 6126 at *27-28 (alternation supplied).  BAM admitted, however, both when it terminated plaintiff and throughout the course of litigation, that notice was legally required.  In that situation, and especially when a defendant, by its own admission after an internal inquiry, failed to send a notice initially, it would make perfect sense to expect the giving of COBRA notice during litigation.  This is particularly true when, as here, the litigation is commenced within the eighteen-month continuation of coverage period.  Serving a notice within that period would afford a plaintiff his or her statutorily guaranteed opportunity to elect to continue prior coverage, while simultaneously tolling any potential penalties against the defendant — all at the meager cost of a postage stamp and an envelop.

---

[77] *Middleton* is an unpublished case from the Middle District of North Carolina and, therefore, is not binding authority in this circuit.  That is also true of the second case BAM cites, *Torres-Negron v. Ramallo Bros. Printing*, 203 F. Supp. 2d 120 (D. P.R. 2002).  *Ramallo* also presented different factual circumstances:  the plaintiff in *Ramallo* received her COBRA notice soon after filing suit.  *Ramallo*, 203 F. Supp. 2d at 123.  In this case, however, plaintiff never received a COBRA notification, despite acknowledgments from defendant that she was entitled to receive it.

Additionally, ending the penalty when a plaintiff files suit would be unwise as a policy matter. Such a rule provides would-be plaintiffs with a dilatory motive to withhold a legitimate claim for COBRA notice in order to accrue additional, daily penalties.

Alternatively, BAM urges the court to set the end-date on December 1, 2007, when plaintiff received comparable dental coverage through Bruno's.[78] BAM relies most heavily on *Brown v. Neely Truck Line*, 884 F. Supp. 1534 (M.D. Ala. 1995) (DeMent, J.), where the Court stated:

> While a defendant may be liable for up to eighteen months following termination, the court finds that the applicable period to which damages may be lawfully assessed in the case at bar is fifteen months — the total of a three month waiting period before [the plaintiff] was accepted into a plan offered by [the subsequent employer] plus the one-year exclusion period for [plaintiff's] pre-existing condition.

*Brown*, 884 F. Supp. at 1542 (alternations supplied). *Brown* cited no binding authority for that conclusion, nor could it: the sentence immediately following the foregoing quote from *Brown*, which BAM omitted from its brief, admits that "[e]stablished law in this Circuit regarding the consequences of failing to render COBRA notice is virtually non-existent." *Id.* In fact, the *Brown* opinion earlier observed that there was a dearth of controlling caselaw on COBRA notice issues. *Id.* at 1540 ("The court acknowledges that there is not an abundance of law in the

---

[78] Doc. no. 48 (Defendant's Post-Trial Brief), at 3-4.

22

Eleventh Circuit regarding notice and the consequences of failing to provide **actual** notice under COBRA.") (emphasis in original).

Whatever the merits of *Brown*'s analysis in 1995, two subsequent Eleventh Circuit cases have sanctioned the penalty end-date as the conclusion of the eighteen-month period during which COBRA coverage could have continued.  In *Wright v. Hanna Steel Corp.*, 270 F.3d 1336 (11th Cir. 2001), defendant never presented plaintiff or his family members with a COBRA notice.  *Wright*, 270 F.3d at 1339.  On appeal, the Eleventh Circuit reviewed whether it was legal error to assess COBRA penalties "totaling $170.00 per day for a period of 18 months" when those penalties were composed of "separate penalties for [plaintiff], his wife, and children."  *Id.* at 1341.  While the Court overturned the penalties as to plaintiff's family because the penalty provision only applied to a health plan participant (*i.e.*, the plaintiff) and not members of the participant's family, the $75 per day penalty that applied to the plaintiff, including its eighteen-month duration, was left intact.  *Id.* at 1333-34.

A year later, in *Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223 (11th Cir. 2002), the Eleventh Circuit considered whether "the district court's imposition of a $20 per day penalty for a period of eighteen months was an abuse of discretion." *Scott*, 295 F.3d at 1231.  The Court found that it was not.  *Id.* at 1332.  Like the plaintiff here, the plaintiff in *Scott* never received a COBRA notice.  *Id.* at 1227, 1230-

23

31.  Just as importantly, the Court affirmed the eighteen-month penalty period, and did so despite the fact that the plaintiff had a prior opportunity "to join his wife's insurance plan at a lower premium."  *Id.* at 1231.

BAM views the date on which plaintiff obtained comparable coverage through her subsequent employment with Bruno's as the "logical endpoint" because, after that date, plaintiff "no longer has any need or use for continuation coverage" under COBRA.[79]  BAM dismisses plaintiff's ability to elect COBRA continuation coverage, even when she could obtain alternative coverage, as merely "theoretical[]."[80] However "theoretical" a choice between COBRA continuation coverage and alternative coverage with a new employer may be, that choice is a Congressionally mandated one afforded to plaintiff.  Consequently, BAM denied plaintiff a legally-entitled choice between two different insurance plans by intentionally failing to provide the notice required by COBRA.

BAM also argues that any penalty imposed after the effective date of comparable insurance coverage obtained through subsequent employment would be a windfall to plaintiff.[81]   BAM misapprehends the issue.  The penalty is "designed more for punishing the violator than compensating the participant or beneficiary."

---

[79] Doc. no. 48 (Defendant's Post-Trial Brief), at 3 n.1.

[80] *Id.*

[81] *Id.* at 4, 6-8.

*Scott*, 295 F.3d at 1232 (citing *Sanlin v. Iron Workers District Council of Tennessee Valley and Vicinity Pension Plan*, 716 F. Supp. 571, 574 (N.D. Ala. 1988) (Acker, J.), *aff'd*, 884 F.2d 585 (11th Cir. 1989)).[82]

### 3. Conclusions on penalty beginning and ending dates

In summary, the penalty period begins on May 11, 2007: *i.e.*, the forty-fifth day after the qualifying event (plaintiff's termination on March 27, 2007). The penalty period ends on September 27, 2008: *i.e.*, eighteen months after plaintiff's March 27, 2007 termination. There are 506 days between those two dates.

### 4. The daily penalty amount

The maximum daily penalty for failing to provide a COBRA notice to a qualified employee is specified in 29 C.F.R. § 2575.502c-1 as $110 a day. The amount of any penalty up to that daily maximum is committed to the discretion of the district court. *See* 29 U.S.C. § 1332(c)(1). Plaintiff asks the court to utilize a staggered method of assessing the daily penalty, increasing the penalty amount at various benchmarks in the life of this litigation.[83] Eventually, plaintiff would increase the penalty amount to the maximum amount of $110 per day.[84] However, plaintiff

---

[82] The term "penalty" is defined as a "[p]unishment imposed on a wrongdoer, usu[ally] in the form of imprisonment or fine; esp[ecially] a sum of money exacted as punishment for either a wrong to the state or a civil wrong (as distinguished from compensation for the injured party's loss)." *Black's Law Dictionary* 1168 (8th ed. 2004); *see also Webster's II New Riverside University Dictionary* 868 (1984) ("1. A punishment established by law or authority for a crime or offense.").

[83] Doc. no. 43 (Plaintiff's Post-Trial Brief), at 18-19.

[84] *Id.* at 19.

25

entreats the court to impose the maximum daily penalty if the court finds, as it has done, that the penalty period should not run until the date of trial.[85]

BAM desires a daily penalty between $40 and $55 dollars, and argues that plaintiff did not suffer any prejudice as a result of its failure to provide the notice.[86] In BAM's view, "[a]lthough notice might still have been technically required, it would have served no purpose as she was covered by her new employer's dental plan."[87] The court has already highlighted that argument's flaws in Part III(A)(2)(b), *supra*. Additionally, a finding of prejudice is not required. *Scott*, 395 F.3d at 1232 (citing *Curry v. Contract Fabricators, Inc.*, 891 F.2d 842, 847 (11th Cir. 1990), *abrogated on other grounds by Murphy v. Reliance Standard Life Ins. Co.*, 247 F.3d 1313 (11th Cir. 2001)).

What incriminates BAM in this case, and justifies the imposition of a greater penalty, is not prejudice suffered by plaintiff, but rather BAM's bad faith and intentional withholding of her COBRA notice.  BAM's own investigations produced no evidence that it had generated and mailed a COBRA notice to plaintiff, even after multiple opportunities to correct its error.  BAM's managerial employees consistently failed to follow up on matters that, by their own admissions at trial, were matters of

---

[85] Doc. no. 50 (Plaintiff's Post-Trial Reply Brief), at 6.

[86] Doc. no. 48 (Defendant's Post-Trial Brief), at 5-7.

[87] *Id.* at 7.

importance.  As discussed in the Part II(C), *supra*, the credibility (or lack thereof) of BAM's employees, as well as the suspicious circumstances surrounding plaintiff's bonus, lead the court to conclude that BAM intentional withheld plaintiff's COBRA notice.  The court will impose a daily penalty of $75 in order to appropriately penalize BAM, as well as deter both it and similarly situated entities from similar conduct in the future.  Because the penalty period consists of 506 days, BAM will be ordered to pay plaintiff $37,950.

## B.    Injunctive Relief

Plaintiff devotes one paragraph in her initial post-trial brief to her request for injunctive relief.  She asks the court to require BAM to file "a detailed description of its system for providing COBRA notices to qualified beneficiaries for comment by Plaintiff and review by the Court.  Of particular concern is the current practice of not sending COBRA notices by certified mail."[88]

Plaintiff is no longer employed by BAM, however.  Therefore, it is unclear why BAM's COBRA notification would be of any significance to her in the future.

Moreover, this court has not found an endemic problem with BAM's current (or even former) process.  The trial focused on the mechanics of *plaintiff's* COBRA notice, and not BAM's notification process generally.  Although BAM's notification

---

[88] Doc. no. 43 (Plaintiff's Post-Trial Brief), at 22.

27

process was labor-intensive and unwieldy, BAM later switched to an electronic system that utilizes Microsoft "Excel" software.[89]  The new system requires "just a few steps," and made the process "a lot easier to deal with and much more manageable."[90]

Furthermore, the materials that COBRA requires need only be transmitted to qualified employees by means of methods "reasonably calculated to ensure actual receipt.  *Material distributed through the mail may be sent by first, second, or third-class mail*."  29 C.F.R. § 2520.104b-1(b)(1) (emphasis supplied).  When the emphasized portion of the preceding regulation is combined with the fact that properly addressed mail sent through the U.S. Postal Service is presumed delivered, *see Hagner v. United States*, 285 U.S. 427, 430 (1932); *In re East Coast Brokers*, 961 F.2d 1543, 1545 (11th Cir. 1992), the court finds no reason to second guess BAM's decision to switch from certified to regular mail.  Plaintiff's request for injunctive relief, therefore, is due to be denied.

## C.    Attorneys' Fees

The court "in its discretion may allow a reasonable attorney's fee and costs" to either party in an action based upon the COBRA statute.  *See* 29 U.S.C. § 1132(g)(1).  Even so, there is no presumption in favor of the imposition of fees and costs.  *Wright*

---

[89] Trial Tr. 32, Aug. 27, 2012.

[90] *Id.* at 33.

*v. Hanna Steel Corp.*, 270 F.3d 1336, 1344 (11th Cir. 2001) (citing *Freeman v. Continental Ins. Co.*, 996 F.2d 1116, 1121 (11th Cir. 1993)).

In evaluating the appropriateness of attorneys' fees, a court must first determine whether the fee claimant can demonstrate "some degree of success on the merits." *Hardt v. Reliance Standard Life Ins. Co.*, ___ U.S. ___, 130 S. Ct. 2149, 2158 (2010); *see also Cross v. Quality Management Group, LLC*, No. 11-15146, 2012 WL 4465227, at *1 (11th Cir. Sept. 27, 2012).  If so, a court then must consider the following factors when deciding whether to award attorneys' fees:  (1) the degree of the opposing party's bad faith; (2) the ability of the opposing party to pay the fees; (3) whether a fee award would deter others; (4) whether the party requesting fees sought to benefit all participants and beneficiaries under the insurance coverage plan, or to resolve a significant legal question regarding the statute; (5) and the relative merits of the parties' positions.[91]  *Wright*, 270 F.3d at 1344-45 (citations omitted).  "No one of these factors is necessarily decisive, and some may not be apropos in a given case, but together they are the nuclei of concerns that a court should address." *Freeman v.*

---

[91] Plaintiff contends that the five factors were rejected by the Supreme Court in *Hardt.*  Doc. no. 46 (Plaintiff's Memorandum in Support of Attorneys' Fees), at 1 n. 1.  Specifically, the Court wrote that "the five factors bear no obvious relation to" the statutory text, and therefore "are not *required* for channeling a court's discretion when awarding fees." *Hardt*, 130 S.Ct. at 2158 (emphasis supplied).  As the Eleventh Circuit subsequently observed, however, *Cross v. Quality Mgmt. Grp., LLC*, No. 11-15146, 2012 WL 4465227, at *1-2 (11th Cir. Sept. 27, 2012), the Court also noted that it did "not foreclose the possibility that once a claimant has satisfied th[e 'success on the merits'] requirement . . . a court may consider the five factors . . . in deciding whether to award attorney's fees." *Hardt*, 130 S.Ct. at 2158 n.8 (alternation supplied).  *Cross* affirmed that approach.  *Cross*, 2012 WL 4465227, at *1-2.

29

*Continental Ins. Co.*, 996 F.2d 1116, 1119 (11 Cir. 1993) (quoting *Plumbers &*
*Steamfitters Local No. 150 v. Vertex Constr. Co., Inc.*, 932 F.2d 1443, 1452 (11th Cir.
1991)).  The Eleventh Circuit prefers that a district court analyze each factor.  *Id.*

With regard to the first factor, this court has already found that BAM exhibited
bad faith in refusing to render the COBRA notice.  *See* Parts II(C) and III(A)(4),
*supra*.

Second, as a large, national company, BAM will be able to satisfy a fee award
against it.  BAM has over 1,000 employees.[92]  Its own website proclaims that it is "the
second largest book retailer in the nation," and that the company "presently operates
of 250 stores in 31 states and the District of Columbia."[93]

Third, attorneys' fees would deter others from acting in bad faith, and with the
same disregard for COBRA's requirements as was exhibited in this action by the three
BAM employees identified in Part II(B), *supra*.  For employers of BAM's size, the
statutory penalty may not alone elicit strict adherence to COBRA's standards.
However, the prospect of attorneys' fees, which often exceed the amount of a
plaintiff's recovery on the merits, is more likely to command the attention of
employers.  Indeed, the Eleventh Circuit has recognized the high deterrent value of
attorneys' fees in cases like this one.  *See National Companies Health Benefit Plan*

---

[92] Trial Tr. 9, Aug. 27, 2012.

[93] *See* http://www.booksamillioninc.com/ (last visited Oct. 16, 2012).

*v. St. Joseph's Hospital, Inc.*, 929 F.2d 1558, 1575 (11th Cir. 1991), *abrogated on other grounds by Geissal v. Moore Medical Corp.*, 524 U.S. 74 (1998).

The fourth factor does not pertain to this case. Plaintiff requested injunctive relief regarding BAM's notification process, but her case focused upon BAM's treatment of her, not relief for others. Moreover, the legal framework surrounding her COBRA claim is relatively straightforward. COBRA required BAM to provide plaintiff with a notice. BAM did not. Therefore, a penalty may be imposed. There has been no "significant legal question" regarding the statutes or regulations at issue.

Finally, the fifth factor (consideration of the merits of the parties' positions) favors the award of attorneys' fees, as do the factors when considered *in toto*.

1.      **The lodestar calculation**

"In calculating a reasonable attorney's fee award, the court must multiply the number of hours reasonably expended on the litigation by the customary fee charged in the community for similar legal services to reach a sum commonly referred to as the 'lodestar.'" *Association of Disabled Americans v. Neptune Designs, Inc.*, 469 F.3d 1357, 1359 (11th Cir. 2006) (citing *Hensley v. Eckerhart*, 461 U.S. 424, 433-34 (1983); *Norman v. Housing Authority of the City of Montgomery*, 836 F.2d 1292, 1299 (11th Cir. 1988)). The lodestar is a presumptively reasonable fee. *City of Burlington v. Dague*, 505 U.S. 557, 562 (1992). The burden of documenting appropriate hours

and hourly rates falls on the fee claimant.  *American Civil Liberties Union of Georgia v. Barnes*, 168 F.3d 423, 427 (11th Cir. 1999); *Norman*, 836 F.2d at 1303.

However, "[t]he court may then adjust the lodestar to reach a more appropriate attorney's fee, based on a variety of factors, including the degree of the plaintiff's success in the suit."  *Neptune Designs*, 469 F.3d at 1359 (citing *Hensley*, 461 U.S. at 435-36).  When a plaintiff achieves only *partial or limited* success, the usual method of multiplying the number of hours expended by a reasonable hourly rate may produce an excessive figure.  *Farrar v. Hobb*, 506 U.S. 103, 114-15 (1992) (citing *Hewitt v. Helms,* 482 U.S. 755, 762 (1987); *Hensley*, 461 U.S. at 436).

Courts also may consider many different factors in assessing the amount of attorneys' fees, including: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill required to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship

with the client; and (12) awards in similar cases.  *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717-19 (5th Cir. 1974).[94]

### a.   Reasonable hourly rate

"A reasonable hourly rate is the prevailing market rate in the relevant legal community for similar services by lawyers of reasonably comparable skills, experience, and reputation."  *Norman*, 836 F.2d at 1299.   The relevant legal community is "the place where the case is filed," which in this case is the Northern District of Alabama.  *Barnes*, 168 F.3d at 437.  The applicant for fees bears the burden of producing satisfactory evidence substantiating the claimed rate, and that burden may be satisfied by "producing *either* direct evidence of rates charged under similar circumstances *or* opinion evidence of reasonable rates."  *Duckworth v. Whisenant,* 97 F.3d 1393, 1396 (11th Cir. 1996) (citing *Norman,* 836 F.2d at 1299)) (emphasis supplied).  The court also is a primary source of expertise on the matter.  *See Norman*, 836 F.2d at 1303.  The task of computing reasonable hourly rates is a sensitive one that is informed by "an analysis of the skills . . . exhibited by the attorney in the case

---

[94] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.  This includes the *Johnson* decision.  In *Hensley*, the Supreme Court reformulated the calculus for computing a reasonable fee, but specifically "acknowledged that district courts may continue to consider the twelve factors outlined by the former Fifth Circuit in *Johnson*."  *Ass'n of Disabled Ams. v. Neptune Designs*, *Inc.*, 469 F.3d 1357, 1359 n.1 (11th Cir. 2006) (citing *Hensley*, 461 U.S. at 434 n.9).

at bar," such as case assessment, expertise in negotiations, organization, knowledge of trial practice and substantive law, and persuasiveness.  *Id.* at 1301.

The hourly rates requested by plaintiff's attorneys Alicia Haynes and Charles Guerrier are $440 and $400, respectively.[95]  BAM objects to both rates.

### i.      Attorney Alicia Haynes

In support of Alicia Haynes' hourly fee request, plaintiff offers the affidavit of Ms. Haynes, as well as the declarations of attorneys Larry Mann, Heather Leonard, and Temple Trueblood.[96]  The Mann, Leonard, and Trueblood declarations state that Ms. Haynes' hourly rate is within the range accepted in this District; and that, in their opinion, she should be awarded fees at $440 an hour.[97]

In BAM's view, these submissions are insufficient to establish the requested rate, as none of them demonstrate that Ms. Haynes "has actually been paid this rate in any case in the Northern District of Alabama."[98]  The issue, however, is whether the requested rate is "reasonable," not whether the attorney actually charged the rate previously.  BAM cites one of Ms. Haynes' prior cases in this District where she

---

[95] Doc. no. 46 (Plaintiff's Memorandum in Support of Attorneys' Fees), at 4.

[96] *See* doc. no. 45-1 (Alicia Haynes Aff.); doc. no. 45-6 (Larry Mann Decl.); doc. no. 45-7 (Heather Leonard Decl.); doc. no. 45-8 (Temple Trueblood Decl.).

[97] Doc. no. 45-6 ¶¶ 2, 6; doc. no. 45-7 ¶¶ 5, 7, 9; doc. no. 45-8 ¶¶ 4, 6, 8.

[98] Doc. no. 47 (Defendant's Response to Application for Attorneys' Fees), at 7-8.

received a $325 hourly fee.[99]  The fee in that case, in addition to being six years old, was reached by the parties' consent.[100]  Plaintiff's reply brief points to a more recent case from 2010 in which Judge Karon O. Bowdre awarded Ms. Haynes a fee calculated at a rate of $400 an hour.[101]  Plaintiff also offers the affidavits of Samuel Hill and Thomas Campbell in support of that rate.[102]

BAM attempts to rebut plaintiff's evidence with the declaration of attorney Jay St. Clair.  That declaration is dated January 6, 2012, and also refers to an attorney, Kenny Haynes, who, to the court's knowledge, did not participate in this case.[103]  Mr. St. Clair and his law firm primarily practice *defense* work in employment discrimination cases.[104]  Here, however, the issue is the hourly rate for a plaintiff's attorney, work that often contains greater risk for the attorney because his or her fees normally hinge upon the outcome of the suit.  Mr. St. Clair states that his firm billed

---

[99] *Id.* at 8; *see* doc. no. 47-1 (Order of Sept. 8, 2006 by Judge R. David Proctor in *Tucker v. Housing Auth. of the Birmingham Dist.*, case no. 2:01-cv-2038-RDP).

[100] Doc. no 47-1 (Order of Sept. 8, 2006 by Judge David Proctor in *Tucker v. Housing Auth. of the Birmingham Dist.*, case no. 2:01-cv-2038-RDP), at 2.

[101] Doc. no. 49 (Plaintiff's Reply Regarding Attorneys' Fees), at 2; *see* doc. no. 49-1 (Order of Sept. 28, 2010 by Judge Karon Bowdre in *Marks v. U.S. Sec. Assocs., Inc.*, case no. cv-08-BE-0459-S), at 3-6.

[102] Doc. no. 49 (Plaintiff's Reply Regarding Attorneys' Fees), at 2; *see* doc. no. 49-2 (Samuel Hill Aff.); doc. no. 49-3 (Thomas Campbell Aff.).

[103] Doc. no. 47 (Defendant's Response to Application for Attorneys' Fees), at 8; *see* doc. no. 47-2 (Jay St. Clair Aff.) ¶ 12 (referencing Kenny Haynes).

[104] Doc. no. 47-2 ¶ 3; *see also* doc. no. 49 (Plaintiff's Reply Regarding Attorneys' Fees), at 3-4).

at a rate of $395 an hour for employment matters in 2011.[105]  A plaintiff's attorney, who takes on greater risk in litigating a case, could reasonably charge a higher rate. Mr. St. Clair also admits that billing rates increase between $10 and $15 a year.[106] When juxtaposed with the rate of $400 an hour that Ms. Haynes attained in 2010, the requested rate of $44 an hour falls within the range of reasonableness.

Plaintiff's evidentiary submissions  demonstrate that the hourly rate requested by Ms. Haynes is reasonable, and this court will use a rate of $440 an hour to calculate her fees.

### ii.      Attorney Charles Guerrier

In support of the $400 an hour rate sought by attorney Charles Guerrier, plaintiff again relies upon the Mann, Leonard, and Trueblood declarations,[107] as well as Mr. Guerrier's affidavit.[108]  Jay St. Clair's declaration does not address Mr. Guerrier's rate.[109]  Instead, BAM observes that Mr. Guerrier is not admitted to practice in Alabama, and that he did not enter an appearance in this case.[110]  From this, and

---

[105] Doc. no. 47-2 ¶ 7.

[106] *Id.* ¶ 13.

[107] Doc. no. 45-6 ¶¶ 2, 6; doc. no. 45-7 ¶¶ 5, 7, 9; doc. no. 45-8 ¶¶ 4, 6, 8.

[108] *See generally* doc. no. 45-9 (Charles Guerrier Aff.).

[109] *See generally* doc. no. 47-2 (Jay St. Clair Decl.).

[110] Doc. no. 47 (Defendant's Response to Application for Attorneys' Fees), at 8.

without any evidence or submissions, BAM concludes that a reasonable rate for Mr. Guerrier is $350 per hour.[111]

Mr. Guerrier has forty years of experience practicing federal employment law in federal court for either non-profit entities or the EEOC.[112]  The Mann, Leonard, and Trueblood declarations opined that Mr. Guerrier's rate comports with that charged by attorneys in this District who possess similar experience.[113] Thus, the court concludes that his $400 an hour rate is reasonable, and that rate will be used to calculate the lodestar in regard to his work.

### iii.   Attorney Karen Cleveland, paralegal Jenny Smith, and the "other paralegals"

The rates of attorney Karen Cleveland, paralegal Jenny Smith, and the "other paralegals" (*i.e.*, Sarah Powell, Robin Brantley, Mary Dasher, Charlotte Davis, and Elizabeth Gilliam[114]) are not contested by BAM.[115]  Their requested rates are as follows: Ms. Cleveland, $215 an hour; Ms. Smith, $150 an hour; and the "other

---

[111] *Id.*

[112] *See* doc. no. 45-9 (Charles Guerrier Aff.) ¶¶ 3-12.

[113] Doc. no. 45-6 ¶¶ 2, 6; doc. no. 45-7 ¶¶ 5, 7, 9; doc. no. 45-8 ¶¶ 4, 6, 8.

[114] *See* doc. no. 45-5 (Time Records), at 20-27.

[115] *See* doc. no. 49 (Plaintiff's Reply Regarding Attorneys' Fees), at 1-2; *see generally* doc. no. 47 (Defendant's Response to Application for Attorneys' Fees).

paralegals," $100 an hour.[116]  Those rates are supported by plaintiff's submissions.[117]

Accordingly, this court will use those rates in calculating the lodestar.

###### b.    Reasonable hours

Plaintiff submitted the following hours for individuals who provided her with legal services: attorney Alicia Haynes, 152.1 hours; attorney Charles Guerrier, 59.5 hours; attorney Karen Cleveland, 2.1 hours; paralegal Jenny Smith, 107.4 hours; and the "other paralegals," 9.3 hours.[118]  Fee applicants must exercise billing judgment by excluding from their fee applications "excessive, redundant, or otherwise unnecessary hours," *i.e.*, "hours that would be unreasonable to bill to a client." *Barnes*, 168 F.3d at 428 (internal citations and quotations omitted).  "[W]hen hours are disallowed[,] the court should identify the hours disallowed and explain why they are disallowed." *Loranger v. Stierheim*, 10 F.3d 776, 783 (11th Cir. 1994).  Moreover, just as "the district court must be reasonably precise in excluding hours thought to be unreasonable or unnecessary, so should the objections and proof from fee opponents." *Norman*, 836 F.2d at 1301.

The court must differentiate hours billed before the court granted partial summary judgment in this case from hours billed after that point.  Billing records must

---

[116] Doc. no. 46 (Plaintiff's Memorandum in Support of Attorneys' Fees), at 4.

[117]  Doc. no. 45-6 ¶ 2; doc. no. 45-7 ¶ 5; doc. no. 45-8 ¶ 4.

[118] Doc. no. 46 (Plaintiff's Memorandum in Support of Attorneys' Fees), at 4.

provide enough information to permit an assessment of whether the hours billed were reasonable.  *See Oxford Asset Management., Ltd. v. Jaharis*, 297 F.3d 1182, 1195-96 (11th Cir. 2002).  The only claim that survived summary judgment was plaintiff's COBRA claim, whereas before summary judgment several other, unsuccessful claims were being litigated.[119]  Evaluating the reasonableness of hours billed subsequent to summary judgment is an easy task, because those hours dealt only with the COBRA claim.  Conversely, hours billed prior to summary judgment are harder to assess, as the attorneys' time records to do not specify which claims were being worked on.[120]

A "district court may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for limited success." *Hensley*, 461 U.S. at 436-37.  Here, the former tactic is most feasible for the post-summary judgment hours, while the latter approach is preferable for the pre-summary judgment hours. The court entered its order granting summary judgment on all claims except the COBRA claim on September 22, 2010.[121]  That date serves as the line of demarcation between, on one hand, the hours that the court will review for specific deletions and, on the other hand, the hours that the court will account for by reducing the fee award traceable to those hours.

---

[119] *See* doc. no. 29 (Memorandum Opinion); doc. no. 30 (Order), at 1.
[120] *See* doc. no. 45-2 (Time Records), at 1-6.
[121] Doc. no. 30 (Order), at 2.

### i.      Attorney Alicia Haynes

Alicia Haynes' post-summary judgment billings are sufficiently detailed as to allow the court to evaluate their reasonableness.  BAM's only specific objection to Ms. Haynes' post-summary judgment billings pertains to the 0.6 hours Ms. Haynes spent reviewing the court's order on summary judgment and mediation.[122]  BAM argues that this time should not be compensated, because summary judgment addressed only the six unsuccessful claims.[123]

Even so, it still was reasonable for Ms. Haynes to review (and bill for reviewing) the court's summary judgment order.  As the attorney of record for plaintiff, Ms. Haynes had an obligation to monitor the progress of the litigation.  This is especially true considering that the order instructed the parties to mediate the remaining COBRA claim.  The court will not exclude the 0.6 hours to which BAM objects.

The court has reviewed the remainder of Ms. Haynes post-summary judgment hours,[124] and it finds that those hours were reasonable.  Ms. Haynes billed a total of 86.3 hours post-summary judgment.[125]  When multiplied with Ms. Haynes $440

---

[122] Doc. no. 47 (Defendant's Response to Application for Attorneys' Fees), at 10.

[123] *Id.* at 9-10.

[124] Doc. no. 45-2 (Time Records), at 7-10.

[125] *See id.*

hourly rate, the product is $37,972.  That amount is not subject to adjustment, because it represents hours billed solely for the successful COBRA claim.

The pre-summary judgment hours[126] present a much stickier wicket.  The fee claimant should maintain records showing time spent on different claims.  *Oxford Asset Mgmt.*, 297 F.3d at 1196.  Unfortunately, Ms. Haynes' time entries do not indicate to which claim a particular task related.[127]  BAM would resolve this difficulty by  reducing the pre-summary judgment hours proportionally:  because plaintiff prevailed on only one of her seven claims in the complaint, her attorneys should recover only one-seventh of their fees.[128]  That approach is not correct, because "[i]t is improper to make the deduction based on a simple ratio of successful issues to issues raised."  *Norman*, 836 F.2d at 1302 (citing *Hensley*, 461 U.S. at 435 n.11; *Popham v. City of Kennasaw*, 820 F.2d 1570, 1579 (11th Cir. 1987)).

BAM does make a specific objection to the 0.9 hours Ms. Haynes billed on April 6, 2010 for reviewing the magistrate judge's Report and Recommendation.[129]  BAM objects to that time for the same reasons it opposed the time billed by Ms. Haynes for reviewing the court's summary judgment and mediation order.  Accordingly, the court rejects BAM's argument on the same grounds.

---

[126] *See id.* at 1-6.

[127] *See id.*

[128] Doc. no. 47 (Defendant's Response to Application for Attorneys' Fees), at 9.

[129] *Id.* at 10; see doc. no. 45-2 (Time Records), at 6.

Ms. Haynes billed 65.8 hours for pre-summary judgment work.[130]  Nothing about these entries was unreasonable in the overall context of the litigation.  Indeed, Ms. Haynes exercised"billing judgment" by "red-lining" some work that related directly to the unsuccessful claims on summary judgment.[131]  When multiplied by her $440 hourly rate, the lodestar for Ms. Haynes' pre-summary judgment work is $29,952.  Nevertheless, because the court must account for the fact that some of the time corresponding to this fee was spent on unsuccessful claims, *see Neptune Designs*, 469 F.3d at 1359 (citing *Hensley*, 461 U.S. at 435-36), that portion of the attorneys' fees award is subject to adjustment in Part III(C)(2)(b), *infra*.

### ii.    Attorney Charles Guerrier

Mr. Guerrier's hours are not subject to the bifurcation used with Ms. Haynes' time, as his hours were all billed after summary judgment.[132]  BAM challenges only two of his entries: 4.0 hours billed on July 10, 2012 for attendance at the pre-trial conference, and 7.5 hours billed on August 27, 2012 for trial.[133]  BAM objects on the grounds that "the appearance of two attorney at [pretrial] conference . . . was

---

[130] *See* doc. no. 45-2 (Time Records), at 1-6.

[131] *E.g.*, *id.* at 3, 5-6.

[132] *See* doc. no. 45-3 (Time Records), at 1-3.

[133] Doc. no. 47, at 10.

duplicative," as was Mr. Guerrier's presence at trial, where he did not enter an appearance, question any witnesses, or make arguments to the court.[134]

The court is not persuaded by BAM's argument.  The concept of a "second chair," *i.e.*, the practice of having another attorney assist with trial, is so widely recognized that it garners treatment in legal dictionaries.  *See*, *e.g.*, *Black's Law Dictionary* 1381 (8th ed. 2004).  As his billing records indicate, Mr. Guerrier provided extensive assistance prior to trial by, for instance, conducting legal research and drafting briefs.[135]  It was reasonable, then, for plaintiff to retain his services through trial in order to assist Ms. Haynes.  In fact, Ms. Haynes, conferred with Mr. Guerrier during trial.[136]  Morever, given Guerrier's pre-trial preparation, it was reasonable for him to accompany Haynes at the pre-trial conference.  All of Mr. Guerrier's billed hours, then, are reasonable.  He billed a total of 59.5 hours.  When multiplied by his $400 hourly rate, his lodestar is **$23,800**.  That amount is not subject to adjustment, as it pertains only to the successful COBRA claim.

### iii.    Attorney Karen Cleveland, paralegal Jenny Smith, and the "other paralegals"

---

[134] *Id.*

[135] Doc. 45-3 (Time Records), at 1-2.

[136] *See*, *e.g.*, Trial Tr. 23, Aug. 27, 2012.

43

Attorney Karen Cleveland billed 2.1 hours for various pre-trial matters.[137] BAM does not contest those hours.[138]  When multiplied by her rate of $215 an hour, Ms. Cleveland's lodestar is $451.50.  That amount is not subject to adjustment, as it pertains only to the successful COBRA claim.

BAM also does not challenge the hours of paralegal Jenny Smith, or the "other paralegals."[139]  Still, to account for time spent on unsuccessful claims, the court must segregate the pre- and post-summary judgment time billed by those individuals.

After summary judgment, Jenny Smith billed 64 hours at the rate of $150 per hour.[140]  Thus, plaintiff is entitled to recover $9,600 for Smith's time, an amount which is not subject to adjustment.  However, Smith billed 43.4 hours before summary judgment.[141]  When multiplied by her hourly rate, the cost of Ms. Smith's pre-summary judgment time is $6,510.  That amount, however, is subject to adjustment to account for time worked on unsuccessful claims.

Plaintiff requests fees for 1.45 hours of the other paralegals' post-summary judgment time.[142]  Multiplied by the paralegals' hourly rate of $100, plaintiff is

---

[137] *See* doc. no. 45-4 (Time Records), at 1.

[138] *See* doc. no. 49 (Plaintiff's Reply Regarding Attorneys' Fees), at 1-2; *see generally* doc. no. 47 (Defendant's Response to Application for Attorneys' Fees).

[139] *Id.*

[140] Doc. no. 45-5 (Time Records), at 14-19.

[141] Doc. no. 45-5 (Time Records), at 14-19.

[142] Doc. no. 45-5 (Time Records), at 26-27.

44

entitled to recover $145, an amount that is not subject to adjustment.  That leaves 7.85 hours of pre-summary judgment time,[143] at the rate of $100 per hour, for a total of $785, an amount that is subject to adjustment.

### 2.    Adjustments to the lodestar amounts

After the lodestar is calculated, a court should adjust the fee to account for the degree of plaintiff's success in the suit.  *Neptune Designs*, 469 F.3d at 1359 (citing *Hensley*, 461 U.S. at 435-36).   Here, in order to account for plaintiff's "limited success" on her non-COBRA claims, the court must reduce the fees that correspond to the time billed before summary judgment.  *See Hensley*, 461 U.S. at 436-37.

### a.    Non-adjusted fees

The fees that correspond to time spent solely on the COBRA claim are not subject to reduction.  They are summarized as follows:

- $37,972 for Ms. Haynes;

- $23,800 for Mr. Guerrier, which represents all of his billed time;

- $451.50 for Ms. Cleveland, which represents all of her billed time;

- $9,600 for Ms. Smith;

- $145 for the "other paralegals."

---

[143] *See id.* at 20-25; *see also* doc. no. 46 (Plaintiff's Memorandum in Support of Attorneys' Fees), at 4 (claiming 9.3 hours of total time for the "other paralegals").

The sum of these fees is $71,968.50.  That amount will be added to the reduced fee calculated in the subsequent section.

### b.     Adjusted fees

The fees that correspond to time billed before summary judgment must be reduced to account for plaintiff's limited success.  Those fees are as follows:

- $29,952 for Ms. Haynes;

- $6,510 for Ms. Smith;

- $785 for the "other paralegals."

Although plaintiff prevailed on only one of her seven claims, the court will not reduce the fees to one-seventh of the above amounts.  *See Norman*, 836 F.2d at 1302 (citing *Hensley*, 461 U.S. at 435 n.11; *Popham v. City of Kennasaw*, 820 F.2d 1570, 1579 (11th Cir. 1987)).  Still, plaintiff's success rate is relevant to the court's analysis. Plaintiff's complaint contained the following claims: (1) Title VII gender discrimination and retaliation; (2) COBRA and ERISA violations; (3) Family and Medical Leave Act violations; (4) Equal Pay Act violations; (5) retaliation; (6) defamation; and, (7) libel and slander.[144]   Some of these claims, namely the defamation, libel, and slander counts, have no factual or legal commonality with the COBRA claim.   Others, such as the two retaliation claims, justified factual

---

[144] Doc. no. 1 (Complaint), at 6-14.

investigation and discovery that overlapped with the COBRA issue.  Moreover, as plaintiff points out, discovery was needed to rebut BAM's assertion earlier in the litigation that plaintiff was fired for misconduct.  Otherwise, had that allegation been proven, it would have disqualified plaintiff from receiving COBRA coverage.[145]

Considering all the relevant factors, the court finds that a two-thirds reduction in the pre-summary judgment fees is equitable.  This reduction strikes the appropriate balance between, on one hand, the work that was necessary to litigate the COBRA claim — including discovery to see if the failure to provide the COBRA notice was part of BAM's alleged retaliation — and, on the other hand, the fact that several claims were unrelated to the COBRA claim.  The adjusted fees are as follows:

- $9,984 for Ms. Haynes;

- $2,170 for Ms. Smith;

- $261.67 for the "other paralegals."

The sum of these fees is $12,415.67.  When added to the non-adjusted fee of $71,968.50, the total attorneys' fee claimed by plaintiff's counsel is $84,385.17.

### c.    Adjustment for counsel's attempt to "game the system"

Part III(A)(2)(a)(i) of this opinion, *supra*, discussed the doctrine of judicial estoppel, one of the primary purposes of which is that of deterring "parties from

---

[145] *See* doc. no 49 (Plaintiff's Reply Regarding Attorneys' Fees), at 10-11 (citing Trial Tr. 41-42, 76-77).

making a mockery of justice by inconsistent pleadings." *Burns v. Pemco Aeroplex, Inc.*, 291 F.3d 1282, 1285 (11th Cir. 2002).  The reason for addressing that doctrine was plaintiff's clearly inconsistent positions regarding the date on which a statutory penalty should end.  As noted in that Part, *before trial* plaintiff argued that, under the applicable law, "the way to calculate the penalty" was to stop counting at the end of the 18-month continuation coverage period.[146]  *After trial*, however, *and after this court orally announced its intention to rule in favor of plaintiff*, her attorneys argued for the first time that the terminus date for calculating a statutory penalty should be the date of trial:  an end-date that would more than triple the penalty period originally urged upon the court.  Both of plaintiff's pre- and post-trial arguments were submitted under Federal Rule of Civil Procedure Rule 11(b); yet, there was no intervening change in controlling legal principles.  Thus, this court concluded that plaintiff's inconsistent positions amounted to nothing more than an effort to game the judicial system:  that is, this court concluded that plaintiff's attorneys

> "deliberately chang[ed] positions according to the exigencies of the moment." *New Hampshire*, 532 U.S. at 750 (citations omitted); *see also Robinson*, 595 F.3d at 1273; *Burnes*, 291 F.3d at 1285.  When, prior to trial, it was unclear which way the court would decide the COBRA issue, plaintiff argued an eighteen-month endpoint, which would result in a significant, but reasonable, penalty period.  After the court orally announced at the conclusion of trial its decision in favor of plaintiff, as well as its displeasure with BAM, plaintiff increased the end-date by

---

[146] Doc. no 37 (Plaintiff's Damages List for Trial), at 6.

approximately four years. *Such conduct should not*, *and will not*, *be tolerated by this court*.[147]

Accordingly, the total attorneys' fee that, otherwise, would be awarded to plaintiff's counsel ($84,385.17) will be reduced by half, to the amount of $42,192.58, as a Rule 11 sanction.

## D.    Other Costs and Expenses

Plaintiff seeks various other costs and expenses.[148]  BAM has not challenged plaintiff's request.[149]  Costs, other than attorneys' fees, "should be allowed to the prevailing party," unless otherwise provided by statute.  Fed. R. Civ. P. 54(d)(1).  Thus, there is a presumption in favor of awarding costs.  *Arcadian Fertilizer, L.P. v. MPW Indus. Servs., Inc.*, 249 F.3d 1293, 1296 (11 Cir. 2001).  Nevertheless, Rule 54(d) does not permit unfettered discretion to tax costs.  *See  Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 445 (1987); *Farmer v. Arabian Am. Oil Co.*, 379 U.S. 227, 235 (1964); *EEOC v. W&O, Inc.*, 213 F.3d 600, 620 (11th Cir. 2000). Instead, this action is governed by 28 U.S.C. § 1920, which enumerates the costs plaintiff may recover.  *See* 28 U.S.C. § 1920(1)-(6); *Crawford Fitting*, 482 U.S. at

---

[147] Part III(A)(2)(a)(i), *supra* (emphasis added).

[148] Doc. no. 46 (Plaintiff's Memorandum in Support of Attorneys' Fees), at 2, 4-5.

[149] *See* doc. no. 49 (Plaintiff's Reply Regarding Attorneys' Fees), at 1-2; *see generally* doc. no. 47 (Defendant's Response to Application for Attorneys' Fees).

445; *Scelta v. Delicatessen Support Servs., Inc.*, 203 F. Supp. 2d 1328, 1339 (M.D. Fla. 2002).

All of the costs that plaintiff lists in a chart entitled "Costs Recoverable Under 28 U.S.C. § 1920"[150] are, in fact, recoverable.  Filing fees are recoverable under § 1920(1), trial transcript costs are recoverable under § 1920(2), witness fees are recoverable under § 1920(3), and specific copying costs are recoverable under § 1920(4).  The sum of these costs is $2,860.87.

The costs that plaintiff lists in her chart of "Miscellaneous Expenses Includable As Attorney's Fees" are different.[151]  That chart contains six categories:  postage; general copying; subpoena service fee; mileage; computerized legal research; and mediation expenses.[152]  No monetary entry is made for "general copying" because, as plaintiff admits in a footnote, the Eleventh Circuit has ruled that general copying costs are not recoverable under § 1920.[153]  In fact, only one of the categories listed by plaintiff is found within § 1920.  The other categories have been specifically excluded by opinions from courts in this circuit, including the very case which plaintiff cites

---

[150] Doc. no. 46 (Plaintiff's Memorandum in Support of Attorneys' Fees), at 5.

[151] *Id.* at 4.

[152] *Id.*

[153] Doc. no. 46 (Plaintiff's Memorandum in Support of Attorneys' Fees), at 4 n.2 (citing *Duckworth v. Whisenant*, 97 F.3d 1393, 1399 (11th Cir. 1996)).

regarding "general copying."   Those "miscellaneous expenses" should be analyzed under § 1920, otherwise plaintiff could circumvent § 1920.

Neither postage nor computerized legal research costs are recoverable under § 1920. *Duckworth*, 97 F.3d at 1399; *Scelta*, 203 F. Supp. 2d at 1339.  Mileage is also not recoverable, *Scelta*, 203 F. Supp. 2d at 1339 (citing *Tang How v. Edward J Gerrits, Inc.*, 756 F. Supp. 1540, 1546 (S.D. Fla. 1991), *aff'd* 961 F.2d 174, 180 (11th Cir. 1992)), and neither are mediation expenses.  *Id.* at 1399; *George v. GTE Directories Corp.*, 114 F. Supp. 2d 1281, 1300 (M.D. Fla. 2000) (rejecting claimant's application for mediation expenses as "various other miscellaneous costs for expenses not enumerated within 28 U.S.C. § 1920").  Of the costs in the "miscellaneous expenses" chart, the only one taxable to BAM under § 1920 is the $50 subpoena service fee.  28 U.S.C. § 1920(1); *see Tang How*, 756 F. Supp.  at 1546, *aff'd* 961 F.2d 174, 180 (11th Cir. 1992); *Am. United Life Ins. v. Am. United Ins.*, 731 F. Supp. 480, 489 (S.D. Fla. 1990).  After adding that amount to her other legitimate costs, plaintiff is entitled to reimbursement by BAM for costs in the amount of $2,910.87.

## IV. CONCLUSION

For the reasons stated herein, the court finds in favor of plaintiff on her COBRA claim, and also awards plaintiff attorneys' fees and other costs.  Plaintiff will be entitled to recover $37,950 as a statutory penalty, $42,192.58 for attorneys' fees, and

$2,910.87 for costs.  The aggregate of the foregoing amounts is $83,063.45.  An

appropriate final judgment will be entered contemporaneously herewith.

      **DONE** this 29th day of October, 2012.

_____

United States District Judge